CLAYTON BROKERAGE CO. OF ST.
LOUIS, INC., a corporation,
Plaintiff-Appellant,

v.

Michael P. PILLA,
Defendant-Respondent.

No. 41998.

Missouri Court of Appeals,
Eastern District,
Division Four.

March 16, 1982.

 

Thompson & Mitchell by David Wells, St. Louis, for plaintiff-appellant.

Mark Belz, Clayton, for defendant-respondent.

SATZ, Presiding Judge.

Appellant, Clayton Brokerage Co. of St. Louis, Inc., (Clayton Brokerage), plaintiff below, appeals from a jury verdict and judgment entered in favor of respondent, Michael Pilla (Pilla) on respondent Pilla's counterclaim. We reverse and remand.

We review the evidence in the light most favorable to the victor, Pilla. *See Kuhlmann v. Rush*, 603 S.W.2d 54, 55 (Mo.App. 1980).

Clayton Brokerage is a corporation which, through its employees, acts as a broker for its customers in the purchase and sale of commodity futures on the Chicago Mercantile Exchange (Exchange). In 1973, respondent Pilla contacted Ira Nathan, an employee of Clayton Brokerage, to discuss the possibility of trading in commodities. Previously, in 1962, Pilla had been a customer of Clayton Brokerage. Prior to placing any orders in 1973, Pilla had a conversation with Nathan in which Nathan discussed the different commodities and also explained the necessity of "putting up" money in margin accounts to cover transactions entered into by Clayton Brokerage on a customer's behalf. Margin calls were made when the customer was in a losing position and additional money was needed to cover the possible loss. If Clayton Brokerage requested additional money for a margin account and no money was furnished, Clayton Brokerage would close out its customer's position in the market. According to Pilla, Nathan told him the customer's loss would be limited to the amount of money in his margin account. Also, according to Pilla's evidence, Nathan stated a customer could get out of the market at any time.

On April 26, 1973, Pilla directed Clayton Brokerage to sell three contracts of July pork bellies. One contract, the basic unit of this transaction, equals 36,000 pounds. The type of transaction entered into by Pilla is known as a short sale. Pilla directed the sale of the contract at 54.175 cents per pound; in effect, he was promising to deliver the pork bellies no later than a specified time in July at the sale price of 54.175 cents per pound. At the same time, he was anticipating a drop in the market price and expecting to purchase the pork belly contracts at a lower price some time before the delivery date. He would, thus, realize a profit from the higher sale price and lower purchase price. Subsequent to his sell order, Pilla directed Clayton Brokerage to buy three contracts of July pork bellies at 52 cents per pound. Clayton Brokerage was unable to complete this buy order because the market price never reached 52 cents per pound. On July 5, Pilla directed Clayton Brokerage to purchase three contracts of July pork bellies at the market price. Nathan entered this order on July 5, when the market price was 58.20 cents per pound. The purchase was not completed.

At Pilla's direction, Clayton Brokerage continued to place daily orders to purchase contracts at the market price.

Apparently, Pilla had deposited some margin money in his pork belly account. Between May and July, Clayton Brokerage requested Pilla to put up additional margin money. In July, Pilla told Clayton Brokerage he would not provide any more margin money. On July 20, Clayton Brokerage mailed a final margin call to Pilla. Pilla failed to respond. On July 25, Clayton Brokerage closed out Pilla's position by purchasing for him three contracts of July pork bellies at 72.70 cents per pound. According to Clayton Brokerage's figures, this purchase meant a loss to Pilla of $20,007.00.[1] Pilla's margin money was not sufficient to cover this loss. Clayton Brokerage made this loss good as it was obligated to do under the rules of the Exchange. Thus, according to Clayton Brokerage's figures, Pilla owed it $20,007.00 plus $135.00 commission, or, $20,142.00. At the time of the loss, Pilla apparently had a credit balance of $8,325.98 in his accounts with Clayton Brokerage. Clayton Brokerage apparently used this balance as a set off against Pilla's alleged $20,142.00 indebtedness, leaving a deficiency of $11,816.02. Without explicitly alleging this precise computation in its pleadings, Clayton Brokerage sued Pilla for the $11,816.02 deficiency.

Pilla counterclaimed. In Count I of his counterclaim, Pilla alleged he ordered the short sale of July pork bellies at 54.175 cents per pound because of the alleged representation of Clayton Brokerage that the purchase or sale of any commodity could be made at the close of any business day. Pilla then alleged that he ordered Clayton Brokerage to purchase pork bellies at 52 cents per pound, the market dropped to that price and Clayton Brokerage would not and advised Pilla it could not purchase the bel-

lies at that price. Pilla prayed for damages of $2,343.60, the amount of profit he would have made had Clayton Brokerage completed the purchase of the pork bellies at 52 cents per pound. Both parties apparently treated this count as a suit for breach of contract seeking loss of profits.

Count II of Pilla's counterclaim was an action for fraudulent representation which basically tracked the allegations of Count I. The representation, alleged to be false in the Count, was that an agent of Clayton Brokerage represented to Pilla that any commodity could be purchased or sold at the close of any business day. Allegedly relying on this representation, Pilla ordered the short sale at 54.175 cents per pound and then subsequently directed a purchase at the lower market price of 52 cents per pound, and Clayton Brokerage allegedly would not and could not make the purchase at the lower price. As in Count I, the actual damages sought was Pilla's alleged loss of profits of $2,343.60.

As noted, Clayton Brokerage's evidence established that the market price of pork bellies never reached 52 cents per pound after Pilla directed Clayton Brokerage to buy at that price. Accepting this evidence, Pilla sought to amend his pleadings at the close of Clayton Brokerage's case by changing his alleged order to purchase at 52 cents per pound to an order to purchase at "the then current market price." He also sought to amend his damages by changing his damages from $2,343.60 to $3,843.98. At this point in trial, the trial judge denied Pilla's request to amend. However, at the close of the entire case, he allowed Pilla to amend his damages as requested. The cause was submitted to the jury, and the jury awarded Pilla $3,800.00 as damages.

■ Clayton Brokerage contends there was a fatal variance between Pilla's verdict

1.

$78,516.00 — Purchase Price on July 25
 (72.70 cents/lb. × 36,000 lbs./contract × 3 contracts)
−58,509.00 — Short Sale Price on April 26
 (54.175 cents/lb. × 36,000 lbs./contract × 3 contracts)
$20,007.00 — Total Loss

directing instructions and his amended pleadings. We agree.

We turn first to Pilla's original pleadings. In both Counts I and II of his counterclaim, Pilla alleged that Clayton Brokerage should have purchased three contracts for pork bellies at a price of 52 cents per pound. Since Pilla also alleged he initially sold three contracts short at 54.175 per pound, Pilla should have realized a profit of approximately $2,343.60. At trial, Pilla was allowed to amend this figure, his request for damages, from $2,343.60 to $3,843.98. This latter figure, however, did not represent a greater loss of profits suffered by Pilla. It represented damages resulting from a different theory of recovery. According to Clayton Brokerage's figures, Pilla had lost $20,007.00, the difference between the short sale at 54.175 cents per pound and the close-out purchase at 72.70 cents per pound. According to Pilla, however, he was not liable for this entire loss. According to him, he was not liable for the loss between the July 5 market price of 58.20 cents per pound and the July 25 close-out purchase price of 72.70 cents per pound, a loss of $15,660.00. Since Clayton Brokerage sued Pilla for a deficiency of only $11,816.02, Pilla claimed in his testimony, without explicit explanation, that Clayton Brokerage owed him the difference between the $15,660.00 loss and the $11,816.02 deficiency, i.e., $3,843.93.[2] Implicit in Pilla's testimonial calculations is his admitted liability for a loss of $4,347.00, the difference between his short sale at 54.175 cents per pound and the purchase which should have been made at 58.20 cents per pound, "the then current market price." It is clear from the account statements admitted into evidence that, prior to the close-out purchase at 72.7 cents per pound, Pilla had a credit balance in his accounts of $8,325.98. When Pilla's admitted loss ($4,347.00) and Clayton Brokerage's commission ($135.00) are deducted from Pilla's credit balance of $8,325.98, it leaves him a credit balance of $3,843.98, his damages as amended.[3] Thus, Pilla's new damage figure represented the credit balance which should have remained in his accounts after deducting the loss he would have suffered had the pork bellies been purchased at "the then current market price," i.e., 58.20 cents per pound. This change in damages necessarily reflected a change in Pilla's theory of recovery. He no longer was seeking loss of profits. Implicitly, he was seeking funds of his which were used by Clayton Brokerage to cover losses greater than the losses his evidence showed he had suffered, i.e., funds of his improperly used or misappropriated. In the parlance of common law pleadings, Pilla now was seeking damages under the old common count of money had and received, *see* *Webster v. Sterling Finance Co.*, 351 Mo. 754, 173 S.W.2d 928, 931 (1943), or, in contemporary jargon, Pilla was suing on an implied contract to pay back funds improperly used or misappropriated. *Id.* 173 S.W.2d at 931.

**2.** Pilla makes this same claim on appeal.

**3.**

| | | |
|---|---|---|
| $62,856.00 | — | Purchase Price on July 5 (58.20 cents/lb. × 36,000 lbs./contract × 3 contracts) |
| −58,509.00 | — | Short Sale Price on April 26 (54.175 cents/lb. × 36,000 lbs./contract × 3 contracts) |
| $ 4,347.00 | — | Pilla's Admitted Loss |

| | | |
|---|---|---|
| $ 8,325.98 | — | Credit Balance |
| −4,347.00 | — | Admitted Loss |
| 3,978.98 | | |
| − 135.00 | — | Clayton Brokerage's Commission |
| $ 3,843.98 | — | Pilla's Amended Damages |

The record does not show that Pilla made the account statements part of his case on his counterclaims.

However, the trial court had limited Pilla to an amendment of his damages. In the body of his petition, he was still pleading a short sale at 54.175 cents per pound and a purchase at 52 cents per pound. The damages which flowed from these allegations were still loss of profits, not funds improperly used or money had and received. Thus, in each Count, Pilla's amended prayer for damages and the implicit theory on which it was based no longer squared with the theory of recovery actually pleaded.

■ Moreover, Pilla's pleadings, even as amended, varied from his instructions. Pilla's verdict directing instruction on his contract claim reads:

### "INSTRUCTION NO. 5

Your verdict must be for defendant on defendant's Counterclaim, Count I, if you believe:

First, plaintiff agreed to purchase for defendant futures contracts on the same day defendant gave to plaintiff an order to purchase those contracts; and

Second, plaintiff did not purchase for defendant futures contracts on the same day defendant gave to plaintiff an order to purchase those contracts; and

Third, because of such failure, plaintiff's contract obligations were not substantially performed; and

Fourth, defendant was thereby damaged."

There is an obvious distinction between this instruction and its ostensible counterpart in the pleadings. In the instruction Clayton Brokerage is faulted for its failure to purchase contracts on the day the purchase was ordered, i.e., its failure to purchase contracts at "the then current market price." In the pleadings, Clayton Brokerage is not faulted for this failure, rather it is still faulted for its failure to purchase contracts at 52 cents per pound, a price the market admittedly never reached. Thus, the breach pleaded is much narrower than the breach submitted to the jury. This variance is fatal to Pilla's recovery. The jury was allowed to return a verdict on Pilla's counterclaim on grounds much broader than the pleadings.[4] Instructions which authorize recovery on grounds broader than the pleadings are erroneous. *See Huter v. Birk*, 439 S.W.2d 741, 745 (Mo.1969); *Koehler v. Burlington Northern, Inc.*, 573 S.W.2d 938, 943 (Mo.App.1978).

■ Arguably, Pilla should have been permitted to amend his pleadings to change his alleged order to purchase the contracts at 52 cents per pound to an order to purchase them at "the then current market price." *See, e.g., East v. Landmark Central Bank & Trust Co.*, 585 S.W.2d 222, 225 (Mo.App.1979).[5] If this requested amendment were permitted, Pilla's instruction would have tracked his amended pleadings. However, even if Pilla's pleadings were amended so that his instruction tracked his pleadings, the theory pleaded by amendment and instructed upon would still fatally differ from the theory proved to be the basis for Pilla's recovery. Taken as amended, Pilla's pleadings would be that Clayton Brokerage should have purchased three contracts of pork bellies at "the then current market price", i.e., at 58.20 cents per pound. Since Pilla was still pleading that he sold short at 54.175 cents per pound, Pilla would then simply be pleading that he suffered a

---

4. We do not address the possible variance between Pilla's verdict directing instruction on fraud and its counterpart in the pleadings.

5. The *East* case, *supra* at 225, teaches that amendment of pleadings to conform to the evidence may be granted where the presentation of the merits will be subserved and where the objecting party will not be prejudiced. Arguably, Pilla's amendment would aid in the presentation of the merits of this action, and, arguably, Clayton Brokerage would not have been prejudiced in the presentation of its defense since its basic defense to an order to purchase at 52 cents per pound would be no different than its defense to the allegation of an order to purchase at the then current market price; namely, that it never told Pilla his purchase could be made on the same day as ordered. This lack of prejudice is perhaps reflected in Clayton Brokerage's failure, at trial, to claim surprise or inability to proceed or to request a continuance. *See Brinkmann Realty Co. v. Deidesheimer*, 201 S.W.2d 503, 508 (Mo.App. 1947).

loss of $4,347.00 not the $20,007.00 asserted by Clayton Brokerage. Sensibly read, this is a pleading of recoupment—the reduction of the loss for which Clayton Brokerage asserted that Pilla was liable. *See Edmonds v. Stratton*, 457 S.W.2d 228, 232 (Mo. App.1970). Recoupment seeks mitigation or extinguishment of an adverse claim. It cannot be used to seek an affirmative judgment. *Id.* at 232. But Pilla's proof of damages was not simply the reduction of the asserted loss from $20,007.00 to $4,347.00. Pilla's proof of damages was that Clayton Brokerage had improperly used or misappropriated his credit balance of $8,325.98, and, since his loss was only $4,347.00, Clayton Brokerage owed him $3,843.98, the difference between his credit balance and his loss.[6] Pilla never pleaded or instructed upon this improper use or misappropriation of funds. For example, his contract claim was based upon an express contract rather than an implied contract for money had and received. His pleadings and instructions, thus, lacked the essential minimum reference to a claim for money had and received. *See Western Casualty & Surety Co. v. First State Bank*, 390 S.W.2d 913, 922 (Mo.App.1965).

■ We are aware that pleadings should be liberally construed, *Cady v. Hartford Accident and Indemnity Co.*, 439 S.W.2d 483, 485 (Mo.1969), *Stanfield v. Nat. Elec. Contractors Ass'n*, 588 S.W.2d 199, 200 (Mo.App.1979), and that instructions are sufficient if they fall within the fair implications of the pleadings. *Price v. Seidler*, 408 S.W.2d 815, 823 (Mo.1966); *Koehler v. Burlington Northern, Inc.*, 573 S.W.2d 938, 943 (Mo.App.1978). However, Pilla's pleadings, if amended as requested, and his verdict directing instruction would do nothing more than plead and submit the theory of recoupment. The theory of improper use or misappropriation of funds, proved by Pilla as his claim for relief, is lacking. Thus, even if Pilla were granted his requested amendment, he would not prevail. Accordingly, we reverse and remand for retrial.

**6.** As previously noted, Pilla's proof of his amended damages was, at best, indirect and by

On retrial, Pilla may still choose to couch his theories of recovery in contract and fraud. Thus, some of the same issues raised in this action may also arise on retrial. We, therefore, briefly address Clayton Brokerage's other points on appeal.

Clayton Brokerage contends that Pilla's theories of fraud and breach of contract were inconsistent and mutually exclusive and, therefore, Clayton Brokerage argues Pilla should have been required to elect between the two theories before submitting the case to the jury. We disagree.

■ The principle of election of remedies has a narrow application. The pursuit of one remedy precludes the pursuit of another only when those remedies are inconsistent. *Davis v. Hauschild*, 243 S.W.2d 956, 959 (Mo.1951); *see Castle v. Tracy*, 463 S.W.2d 777, 780–781 (Mo.1971). Pilla, in the present case, sued for breach of contract and, apparently, for being fraudulently induced into that contract. Thus, Pilla is not suing for rescission of a contract and, at the same time, suing in fraud for damages. If he were pursuing these two theories of recovery, he would be pursuing inconsistent remedies for the rescission would require disaffirmance of the contract and fraud would require affirmance of the contract. *Timmons v. Bender*, 601 S.W.2d 688, 690 (Mo.App.1980). *Yost v. Seigfreid*, 234 S.W.2d 231, 233 (Mo.App.1950). Here, however, Pilla's action for fraudulent representation is not inconsistent with his action for breach of contract. *Bankers Trust Co. v. Pacific Employers Insurance Co.*, 282 F.2d 106, 110 (9th Cir. 1960); *Fredonia Broadcasting Corp., Inc. v. RCA Corp.*, 481 F.2d 781, 790 (5th Cir. 1973). As explained in the *Banker Trust* case: L.C. 110

> "It is the law that one who has been fraudulently induced into a contract may elect to stand by that contract and sue for damages for the fraud. When this happens and the defrauding party also refuses to perform the contract as it

inference.

stands, he commits a second wrong, and a separate and distinct cause of action arises for the breach of contract. The same basic transaction gives rise to distinct and independent causes of action which may be consecutively pursued to satisfaction."

Thus, Clayton Brokerage's contention that Pilla's two theories of recovery were inconsistent must fail. The trial court was not required to make Pilla elect between the two on that ground.

 While the theories of fraud and breach of contract as pursued by Pilla were not inconsistent, the theories must be pursued with caution. At the present trial, Pilla was allowed to submit both theories of recovery to the jury while proving only a single item of damages. For each theory of recovery, Pilla proved the same $3,843.98 as his damages. If the jury followed Pilla's verdict directing instruction for each theory of recovery and the respective damage instruction, it would have returned the same damages for each theory and, thus, would have awarded Pilla double damages.[7] Instructions which submit to the jury overlapping or double damages are improper. *See, e.g., Waymire v. Carter*, 366 S.W.2d 74, 80 (Mo.App.1963); *Faust v. Pope*, 132 Mo.App. 287, 111 S.W. 878, 880 (1908). While Pilla's recovery in fraud does not necessarily preclude his further recovery in contract, he may not recover damages in excess of his actual injury. *See Clements Auto Co. v. Service Bureau Corp.*, 298 F.Supp. 115, 140 (D.Minn.1969); *E. H. Boerth Co. v. LAD Properties*, 82 F.R.D. 635, 646 (D.Minn. 1979). It is not clear from the record here whether Pilla did in fact receive double damages, because the jury's verdict was returned in a form which did not comply with the forms submitted by the court.[8] On remand the problem of double damages can be avoided by Pilla proving different damages for each of his theories of recovery. Otherwise, the trial court should take appropriate action to insure Pilla does not receive double damages.

 Clayton Brokerage also contends Pilla failed to prove Clayton's knowledge of the falsity of its representations. Since that knowledge is a requisite element in a claim of fraud, *Cantrell v. Superior Loan Corp.*, 603 S.W.2d 627, 634 (Mo.App. 1980), *Hamra v. Boone County Development Co.*, 602 S.W.2d 721, 724 (Mo.App. 1980), Clayton Brokerage argues it was error to instruct the jury on fraud. No extended dissertation is needed to dispose of this issue. Suffice it to say that Pilla did make a submissible case, albeit tenuous, on the element of knowledge. If Pilla wishes to pursue the fraud issue on retrial, he may wish to adduce more explicit operative facts to support the submissibility of his fraud theory of recovery.

Clayton Brokerage's final complaint concerns the failure of the jury to render a verdict on its claim against Pilla. The jury returned only a single verdict on the two counts of Pilla's counterclaim. It did not return a verdict on Clayton Brokerage's claim. The matter is not likely to arise on retrial and we do not address it here.

Judgment reversed and cause remanded.

SMITH and SIMON, JJ., concur.

---

**7.** Naturally, this method of awarding damages was carried out in the verdict forms which read:

"If all of you agree upon a verdict in favor of the defendant upon Count I of his Counterclaim, it may be in the following form:

'We, the jury, find the issues in favor of the defendant upon Count I of his Counterclaim and assess his damages at $____ (stating the amount).

_____, Foreman.'

If all of you agree upon a verdict in favor of the defendant upon Count II of his Counterclaim, it may be in the following form:

'We, the jury, find the issues in favor of the defendant upon Count II of his Counterclaim and assess his damages at $____ (stating the amount).

_____, Foreman.' "

**8.** The jury's verdict reads:

"We the undersigned jurors, find the issues in favor of the defendant upon Count I and II of his counterclaim and assess his damages at $3,800.00."