Dale **CREWSE** and Bobbie **Crewse,**
**Plaintiffs-Respondents,**

v.

**SHELTER MUTUAL INSURANCE COMPANY, Defendant-Appellant.**

**No. WD 35976.**

Missouri Court of Appeals,
Western District.

Dec. 31, 1985.

Motion for Rehearing and/or Transfer to Supreme Court Overruled and Denied March 4, 1986.

**36**

James P. Valbracht, Chillicothe, for defendant-appellant.

James J. Wheeler, Keytesville, for plaintiffs-respondents.

Before BERREY, P.J., and DIXON and KENNEDY, JJ.

BERREY, Presiding Judge.

Shelter Mutual Insurance Company appeals from a jury verdict in the amount of $22,400 on the policy, and interest and attorney fees in the amounts of $2,226 and $4,000, respectively. The defendant insurance company contends (1) that the insurance policy was void ab initio due to material misrepresentations made in the insurance application; (2) and that the trial court erred in submitting jury instructions number 7, 10 and 11. This court affirms but reduces the amount of interest awarded.

On May 16, 1980, plaintiffs purchased a house in DeWitt, Carroll County, Missouri, for $2,400 and gave a mortgage of $2,200.00 to the Commerce Bank of Brunswick, Missouri.

In the spring of 1982, the Crewses decided to do some general remodeling on the house. After contracting the Commerce Bank of Brunswick for potential financing,[1] Dale Crewse telephoned Larry Sides, an insurance agent for Shelter Insurance Company, to arrange for the procurement of home owners insurance.

Mr. Crewse had purchased insurance for his automobiles on several occasions from Mr. Sides. On March 21, 1982, Mr. Crewse reported a fire loss on his pickup truck to Mr. Sides as well as the adjuster for Shelter, Larry Callahan.

Following up on Mr. Crewse's contact with Mr. Sides for the purchase of the home owner's insurance, Bobbie Crewse, wife of Dale Crewse, met Mr. Sides' at his office in Carrollton, Missouri, on March 31, 1982. In making application for the insurance, Mr. Sides read the questions on the form and Mrs. Crewse responded to the questions asked. Mr. Sides then filled in her answers on the application.

When asked about any previous fires or thefts, Mrs. Crewse testified: "I said,

'Well, you know about the truck' and he said, 'Yes, but that is automobile, and this pertains to real estate.'" Mrs. Crewse further testified Mr. Sides never asked her any questions concerning previous bankruptcies, delinquent accounts in the last five years, or, particular conditions of the house such as the type of flue, the number of circuits or the condition of the wiring. These inquiries were listed on the application and answers were filled in.

She also stated at the time she did not have $500 in furs, jewelry or fine arts and antiques as noted on the application and did not answer as such.

On cross-examination, Mrs. Crewse said that although she did remember the fire damage to the vehicle owned by her husband in 1978 or 1979, she did not recall the fire loss sustained to his vehicles in 1975 or 1976. The Crewses were married in 1976. Although at the deposition she testified she could not remember whether questions concerning prior fire losses, bankruptcy, etc. were asked, there was also evidence that Mrs. Crewse was sick with 104 temperature on the day the deposition was taken.

Mrs. Crewse testified after Mr. Sides completed the questionnaire, he "just pushed it over ... with his hand on it" and showed her where to sign. Mrs. Crewse signed the application without reading it.

Mr. Sides testified he asked Mrs. Crewse each question on the application and wrote the responses as given by her. He stated Mrs. Crewse answered "No" to the questions of whether any previous fire losses or thefts had occurred and whether the Crewses had taken bankruptcy within the last five years. He testified he had no knowledge of the fire loss on March 21, 1982, as his secretary did not tell him of every reported fire loss. Mr. Sides' records, however, contained the information concerning the fire.

1. The Crewses made a promissory note in the amount of $7,021.27 at 17.0 percent interest per annum to the Commerce Bank of Brunswick on June 17, 1982. The Crewses made another note

dated September 16, 1982, in the amount of $2,500 at 17.0 percent per annum to the same bank.

After signing the application, Mrs. Crewse paid Mr. Sides $115.40 for the first annual premium. Although Mr. Sides testified to the contrary, Mrs. Crewse stated she was not given a copy of the application.

Mr. Crewse testified he sustained fire losses to his motor vehicles in 1975 or 1976 and in 1978 or 1979 and, as previously mentioned, in March 1982. Mr. Crewse filed for bankruptcy in 1979.

In the summer of 1982, a hail and wind storm damaged the house and a claim was made on the home owner's policy. Mr. Crewse spoke with Shelter Insurance agents and received money for the damage sustained.

On March 13, 1983, the Crewses' home and contents, including materials to build a garage, were completely destroyed by fire. Larry Callahan, an adjuster for Shelter, gave the Crewses a check for $1,500 as an advance payment on March 14, 1983; however, Shelter reserved their rights to proceed with further investigation before the full claim would be paid. At that time, the Crewses openly responded that they had suffered prior fire losses and filed for bankruptcy in 1979 when asked similar questions as were contained in the insurance application by Mr. Callahan.

On April 4, 1983, a proof of loss schedule was filed with Shelter. On April 29, 1983, the insurance company informed the Crewses the claim would not be recognized as Shelter investigators had found they had taken bankruptcy in 1979 and sustained fire losses prior to the application with Shelter.

Dave Aufrenc, a property underwriter for Shelter, testified he approved of plaintiffs' application on April 8, 1982. He stated had he known of the previous fire losses, his actions on the application would have been different if "these losses were questionable." He stated the application would not have been approved if he had known about the bankruptcy in 1979.

There was testimony, however, from Claude Hutchinson, an agent for various insurance companies as well as from Mr. Aufrenc that other insurance companies do not find bankruptcy to be a factor when considering an application for property insurance against fire.

Shelter Insurance alleges the policy was void ab initio because the misrepresentations made by Mrs. Crewse in the application were material as a matter of law.[2] In *Miller v. Plains Insurance Company,* 409 S.W.2d 770, 773 (Mo.App.1966), the court noted the insurer "was not limited to ordinary cancellation of the policy to avoid liability" and held an insurance policy void ab initio because of material misrepresentation made by the insured. When an insurance company seeks to cancel the policy it is merely terminated prior to its expiration. *Waynesville Security Bank v. Stuyvesant Insurance Co.,* 499 S.W.2d 218, 220 (Mo. App.1973). In contrast, a contract which is declared void ab initio is "null from the beginning if it seriously offends law or public policy." Black's Law Dictionary 1411 (5th Ed.1979). *See Prudential Property and Casualty Insurance Co. v. Cole,* 586 S.W.2d 433 (Mo.App.1979) (homeowner's policy declared void ab initio on the basis of fraudulent misrepresentations.)

In *Haynes v. Missouri Property Insurance Placement Facility,* 641 S.W.2d 497, 499 (Mo.App.1982) the court stated:

The fact that there were misrepresentations are not sufficient alone to void the policy. A representation in an application for insurance, which is not in the form of a warranty or incorporated in the policy itself, must not only be false, but also material to the risk in order for the insurer to avoid its policy.

Defendant, an insurer, argues it would have increased the premium or refused to issue the policy altogether had the questions been answered truthfully. *Bearden*

2. On April 29, 1983, Shelter notified the Crewses that the policy would not be recognized. Shelter attempted to preserve the remedy of treating the policy void ab initio by returning the premium which Mrs. Crewse had paid. Shelter then on May 10, 1983, purchased Crewses' notes from Commerce Bank.

*v. Countryside Casualty Co.*, 352 S.W.2d 701, 707 (Mo.App.1961).

■ The question presented is not whether the insurer was actually influenced. A misrepresentation is material if it would likely affect the conduct of a reasonable man with respect to his transaction with another. *Miller, supra,* at 774. In other words, "What those engaged in the ... insurance business, acting reasonably and naturally, in the accordance with the practice usual among such companies under such circumstances would have done had they known the truth." *Haynes, supra,* at 499, (citing to *Chambers v. Metropolitan Life Insurance Co.*, 235 Mo.App. 884, 138 S.W.2d 29, 39 (1940).

■ Therefore, although Mr. Sides' testimony that he would not have submitted the application had he known of the bankruptcy is one factor to be considered, it is not controlling. Evidence was also presented that the insurance industry does not generally consider bankruptcy to be a factor in the decision in accepting an application for homeowner's insurance. Regardless of whether a misrepresentation concerning the Crewses' bankruptcy in 1979 had been made, the jury had sufficient evidence to find bankruptcy was not material to the risk in this case.

■ Whether the failure to disclose a prior fire on the application for insurance was material as a matter of law or as a matter of fact must be viewed on a case by case basis. Shelter attempts to distinguish *DeLisle v. Cape Mutual Insurance Co.*, 675 S.W.2d 97 (Mo.App.1984) in which an undisclosed fire loss was held not to be material and, therefore, insufficient to avoid the policy. However, the instant case and *DeLisle* reveal significant similarities.[3]

First, here as in the *DeLisle* case, there was evidence that the defendant had independent knowledge of a previous fire loss. *Id.,* at 100. Mr. Crewse reported the fire

loss on his pickup truck to Mr. Sides' secretary and Mr. Callahan on March 21, 1982, ten days prior to Mrs. Crewse making application with Shelter thus putting Mr. Sides and Shelter on notice. The knowledge of its agent is imputed to the insurer and the insurer, "may be bound not only when the agent knows the truth, but when he is in a position where he should know the truth from the circumstances." *Macalco, Inc. v. Gulf Insurance Co.*, 550 S.W.2d 883, 895 (Mo.App.1977).

Second, in the *DeLisle* case, the insurer's agent completed the application and the insured was not asked any questions. *DeLisle, supra,* at 100. In the instant case, the evidence reveals Mr. Sides did ask Mrs. Crewse some questions; however, there was conflicting evidence of whether all the questions on the application were asked. There was also evidence that agent Sides may have thwarted further discussion concerning previous fires by suggesting the question dealt only with fires on real estate.

■ The court did not err in failing to sustain Shelter's motion for directed verdict at the close of the plaintiffs' evidence on plaintiffs' claim for a breach of contract as well as the motion for directed verdict at the close of Shelter's evidence on its counterclaim for fraud or for failing to sustain Shelter's motion for judgment notwithstanding the verdict, or in the alternative motion for a new trial as there was evidence to support the jury's resolution of this conflict.

In most instances, the question of whether the misrepresentations in an application were material is one for the trier of fact to decide. *Weekly v. Missouri Property Insurance Placement Facility*, 538 S.W.2d 375, 378 (Mo.App.1976); *Haynes, supra,* at 499. Since there was conflicting evidence on this issue the jury is entitled to resolve this conflict. The jury found Shelter did not meet its burden to establish its right to avoid the policy.

---

**3.** In *DeLisle,* as in this case, the applicants signed the application without reading them. This court adopts the view of the *DeLisle* court

that it is unnecessary to review the cases stating that an applicant is conclusively bound by his signature. *Id.,* at 100.

Shelter urges this court to find that the trial court erred in submitting Instruction No. 7 as it does not accurately reflect the law in this case and fails to require the jury to find that Shelter was obligated on the contract. Instruction No. 7 patterned after MAI No. 26.02 is a verdict director in which the sole issue is the breach of a bilateral contract. Shelter contends this instruction failed to hypothesize the necessary element that the policy was in force; Shelter's position is that the policy was void ab initio as a result of the material misrepresentation. This argument is unpersuasive for two reasons.

First, as Shelter notes, "it is well settled law that an essential element of a verdict directing instruction may not be omitted therefrom unless such element is conceded." *Carter v. Boy's Club of Greater Kansas City*, 552 S.W.2d 327, 333 (Mo.App. 1977). In support of the contention that Shelter conceded the validity of the policy, plaintiffs point to Shelter's answer which states, "it issued the policy referred to by plaintiffs ... purportedly to be effective from March 31, 1982, to April 27, 1983,...." This court, however, does not have to look to Shelter's answer to determine whether Shelter admitted the policy was in effect. The insurance company gave validity to the policy by satisfying the Crewses' claim for the damage caused by the hail and wind storm. The insurance company claimed the policy was not in existence only when it was for their substantial benefit.

Secondly, if an instruction omits a necessary element, this error can be cured by the submission of the defensive matter in another instruction. *Scott v. Missouri Insurance Co.*, 246 S.W.2d 349, 354 (Mo.App. 1952). Plaintiffs' Instruction No. 7 referred the jury to Instruction No. 9, patterned after MAI No. 32.19, for the affirmative defense of misrepresentation tendered by the defendant Shelter.

Shelter also contends the trial court erred in submitting Instruction No. 11 which parallels the language of section 375.420, RSMo 1978, because the evidence did not support a finding that their refusal to pay the claim was in any manner vexatious or in bad faith.

Section 375.420, RSMo, states in part that:

If it appears from the evidence that such company has refused to pay such loss without reasonable cause or excuse, the court or jury may, in addition to the amount thereof and interest, allow the plaintiff damages not to exceed twenty percent of the first fifteen hundred dollars of the loss, and ten percent of the amount of loss in excess of fifteen hundred dollars and a reasonable attorney's fee and the court shall enter judgment for the aggregate sum found in the verdict.

In *DeWitt v. American Family Mutual Insurance Co.*, 667 S.W.2d 700 (Mo. banc 1984), the court stated that where "there is no appropriate MAI instruction, the verdict directing instruction must follow the substantive law and be understandable." *Id.*, at 711, (citing to *National Super Markets, Inc. v. Shower*, 613 S.W.2d 154, 156 (Mo. App.1981). The *DeWitt* court also stated that a jury instruction based on the above statute and similar to the one submitted by the plaintiffs was not confusing and did not mislead the jury. *Id.*, at 711. This court finds in the instant case that plaintiffs' Instruction No. 11 was not confusing or misleading.

The jury did not award a percentage amount in damages for vexatious refusal to pay; however, the jury awarded $4,000 in attorney fees. Such an award of attorney fees without an award for vexatious damages is permitted. The jury's failure to award vexatious damages does not nullify this award of attorney fees. *Travelers Indemnity Co. v. Woods*, 663 S.W.2d 392, 397 (Mo.App.1983); *DeWitt v. American Mutual Insurance Co., Id.*, at 710.

Section 375.420, RSMo 1978, must be strictly construed as it is penal in nature. *Fohn v. Title Insurance Corporation of St. Louis*, 529 S.W.2d 1, 5 (Mo. banc 1975). The insured must show the refusal was

willful and without reasonable cause as the facts would appear to a prudent and reasonable man before trial. *Hay v. Utica Mutual Insurance Co.*, 551 S.W.2d 954, 958 (Mo.App.1977). The jury may find, however, vexatious delay upon a general survey and consideration of the whole testimony and all the facts and circumstances in connection with the case. *DeWitt, supra,* at 710.

■ The case must turn on the particular facts presented. *Fohn, supra,* at 6. Without reviewing the entire record, several facts in the evidence point to bad faith on defendant's part. First, agent Sides knew of a previous fire loss and still processed the application. Secondly, evidence was presented that there were answers written to questions on the application that were never asked. Finally, the defendant's adjuster investigated and paid a claim on the policy submitted by the plaintiffs for wind and hail damage to their home in the summer of 1982. At that time, Shelter again had the opportunity to review the application. Without notification of the errors in the application, the plaintiffs had no reason to doubt the validity of the policy. Shelter apparently found the inaccuracies only when it was most profitable to do so.

Appellate courts should sustain the jury's verdict "unless there is no substantial evidence to support it or it was against the weight of the evidence or it erroneously declares or applies the law." *DeWitt, supra,* at 710. This court finds evidence to support the jury's verdict for attorney fees based on Shelter's vexatious refusal to pay.

Finally, the defendant insurer alleges trial court error in admitting Instruction No. 10 patterned after MAI No. 4.08 and modified pursuant to section 379.140, RSMo 1939. The instruction to the jury stated:

If you find in favor of plaintiffs on plaintiffs [sic] claim for damages then you must award plaintiffs the sum of $22,400 with interest rate of nine percent (9%) per annum, from March 13, 1983, less any amount the property depreciated between the time the insurance policy was issued and March 13, 1983.

The Crewses were insured for $15,000 on a dwelling house, $1,500 for appurtenant structures, $6,000 for unschedule personal property, and $1,500 for additional living expenses totaling $24,000 with a deductable amount of $100. The jury returned a verdict of $22,400. The figure of $22,400 is arrived at by subtracting the $100 deductible and the $1,500 additional living expenses paid by Shelter the day after the fire from the total amount insured.

Shelter erroneously contends the appurtenant structures, insured in the amount of $1,500, were not totally destroyed because a small tool shed on the back of the property did not burn. Mr. Crewse testified he had purchased building materials for a garage which were destroyed in the fire along with his home and contents. The policy definition for appurtenant structures includes "a detached *garage* on the premises" and "materials and supplies located on the premises or adjacent thereto, intended for use in construction, alteration or repair of such garage." A "garage" in its ordinary meaning does not encompass a tool shed or outbuilding. The destruction of the materials described by Mr. Crewse, however, unequivocally comes within this policy provision.

The evidence concerning the value, type and quantity of the building materials for the garage construction was virtually nonexistant.[4] At trial Shelter contested whether the appurtenant structure was actually destroyed; no evidence was presented to dispute the actual value or the amount of depreciation of the materials for the garage. The court in *Wells v. Missouri Property Insurance Placement Facility,* 653 S.W.2d 207, 210 (Mo. banc 1983) noted,

---

**4.** The dissent alleges an amount of $200 as the value of the building materials for the garage because the proof of loss statement lists $200 for the loss of "building materials." These materials could have been for kitchen remodeling, etc. This court cannot jump to the conclusion that this entry on the proof of loss specifically refers to the materials for the garage without additional evidence.

"[t]he insurer bears the burden of proving depreciation, and *absent such proof, the amount of the policy conclusively establishes the value of the property.*" (Emphasis added).

■ Assuming that the materials for the garage were less than the insured amount, the defendant is still required to pay the full $1500, the total amount insured on appurtenant structures. In *Joyce v. St. Paul Fire and Marine Insurance Co.,* 211 S.W. 390, 390 (Mo.App.1919) there was a difference between the policy amount and the actual cash value amount of the property. The court stated:

[T]he actual cash value of the property might have been only $750 at the time of the fire; yet defendant, having agreed on a greater value when the policy was written, was held to that value, however, excessive, if there had been no depreciation up to the time of the fire. *Id.,* at 390.

*See also, Gamel v. Continental Insurance Co.,* 463 S.W.2d 590, 593–595 (Mo.App. 1971). Similarly, Shelter agreed to a policy amount of $1,500 on the appurtenant structures, and is liable for that amount unless evidence was presented concerning the amount of depreciation.

Shelter also attempts to dispute the amount of unscheduled personal property for $6,000. The law in Missouri is, however, that "the defendant [insurer] shall not be permitted to deny that the property insured thereby was worth at the time of the issuing of the policy the full amount therein on said property." Section 379.140; *see* § 379.145–160, RSMo 1978; *Wells, supra,* at 210. Therefore, the evidence supports the amount that the Crewses were entitled to receive under the policy as well as the instruction submitted by plaintiffs as it directed a verdict in that amount if the issues were found in favor of the Crewses.

Shelter argues that plaintiffs' Instruction No. 10 more closely resembles MAI 4.09 rather than MAI 4.08 submitted by plaintiffs thus resulting in prejudicial error. The "ultimate test" where there is no applicable MAI, however, "is whether the in-struction followed the substantive law and whether it could be understood." *Kirkwood Medical Supply Co. v. Ann Patterson Enterprises,* 511 S.W.2d 433, 435 (Mo. App.1974).

In case of total loss, as in plaintiffs' case, Section 379.140 states in part:

[T]he measure of damage shall be the amount for which the same was insured, less whatever depreciation in value, below the amount for which the property is insured, the property may have sustained between the time of issuing the policy and the time of the loss, and the burden of proving such depreciation shall be upon the defendant.

In submitting Instruction No. 10 plaintiffs cited *Wells, supra,* which stated "Section 379.140 ... establishes as the measure of damages for a total loss of real property the face value of the policy less the amount the property depreciates between the time the policy is issued and the time of the casualty." *Id.* at 210. *See also, Duckworth v. United States Fidelity and Guaranty Co.,* 452 S.W.2d 280, 282 (Mo.App. 1970) (court held section 379.140 damages applied to personal property as well as real property). Thus, the instruction as submitted by plaintiffs appropriately reflected the law of this state and produced no prejudicial error.

■ The defendant also alleges Instruction No. 10 is contrary to the law as applied to the evidence in that they were entitled to a $8,887.44 credit for satisfaction of the plaintiffs' note to the Commerce Bank of Brunswick, Missouri, and that the interest begins from June 3, 1983, sixty days after the date of proof of loss and not from the date of loss, March 13, 1983.

Shelter's payment to the Brunswick bank satisfying the *Crewses' obligation to that bank* may be viewed in one of two ways. The satisfaction of the note may be seen as a partial prepayment of the $15,000 insurance on the dwelling building and the $8,867 should have been accounted for in the instruction. On the other hand, Shelter's payment may be viewed as a purchase

of the right to sue on the note as against the Crewses and replace the bank as a substituted creditor. The jury believed the latter to be the correct view, as does this court in this case.

Shelter Insurance stated that through the Crewses' misrepresentation they became obligated on the notes pursuant to the standard mortgage clause in the insurance policy.[5] The clause states, in part:

> If this Company shall claim no liability existed as to the mortgagor or owner, it shall to the extent of payment of loss to the mortgagee, be subrogated to all the mortgagee's rights of recovery, but without impairing mortgagee's right sue; *or it may pay off the mortgage debt and require an assignment thereof and of the mortgage.*

(Emphasis added). Policy provisions like the one above have been held valid and enforceable. *Mosby v. Aetna Insurance Co.*, 285 Mo. 242, 225 S.W. 715 (Mo.1920); *Kilpatrick v. Hartford Fire Insurance Co.*, 701 S.W.2d 755 (Mo.App.1985).

In *Kilpatrick, supra,* this court upheld a directed verdict in favor of the insurer on its counterclaim for the amount of the insured's notes purchased by Hartford. The *Kilpatrick* court specifically noted:

> The purchase of the notes by Hartford did not constitute payment of the fire insurance claim. Rather by purchasing the notes and seeking payment from Kilpatrick, Hartford stood in the same position as any party who purchased the notes and then sought to enforce payment. Since the claim had not been paid by the purchase of the notes, the court correctly entertained Kilpatrick's action on the policy.

*Id.,* at 758.

At the time Shelter exercised its option under the contract, the notes to the bank were current as the Crewses had made their last payment to Commerce Bank on April 30, 1983. No evidence was presented by Shelter that the Crewses were in arrears in their payment of the note since the purchase of the notes by Shelter. These facts support the jury's implicit finding that the defendant became a purchaser of the notes. *Cf. Thompson v. Longan,* 42 Mo.App. 146 (1890) (the court found ample evidence to support the jury's finding that the holder of a note secured by a mortgage was a purchaser from the original owner rather than finding the debt had been paid). Similarly, there was sufficient evidence to support the jury's finding against the defendant Shelter for the amount of the notes on their counterclaim for fraud against the Crewses.[6]

---

**5.** Shelter alleges in its answer to plaintiff's petition as well as in its counterclaim for fraud that it is entitled to an offset for the amount of the notes because of the alleged misrepresentations committed by the Crewses. Facts were not pleaded or proved that the Crewses were in default of the notes after the assignment. This opinion does not preclude Shelter from seeking repayment in another cause of action upon that theory.

**6.** The dissent sua sponte contends Shelter's payment should be credited against Shelter's liability on the policy under the theory of recoupment which is used purely as a defensive matter. Several difficulties arise, however, in the application of this theory to the instant case.

It has been observed that,
[B]y such a defense [as purely defensive recoupment] the defendant does not deny the contract and the plaintiffs performance under it, but by proof of defective performance he seeks to avoid his liability to the plaintiff for payment of the agreed price....

*Staab v. Thoreson,* 579 S.W.2d 414, 419 (Mo. App.1979) (quoting *Brush v. Miller,* 208 S.W.2d 816, 821 (Mo.App.1948).

As previously noted, defendant-Shelter alleges that the policy was void ab initio: the insurance contract never had any legal significance. By denying the existence of the contract, the defendant can only pursue an affirmative counterclaim on the independence of the standard mortgage clause set out above.

Relying on *Clayton Brokerage Co., etc. v. Pilla,* 632 S.W.2d 300, 305 (Mo.App.1982), the dissent asserts the Shelter's counterclaim based in tort does not bar the simultaneous submission of the theory of recoupment under the contract. The *Clayton* court, however, further explained that:
Pilla, in the present case sued for the breach of contract and, apparently for being fraudulently induced into the contract. Thus, Pilla is not suing for rescission of a contract and, at the same time, suing in fraud for damages. If he were pursuing these two theories of recovery, he would be pursuing inconsistent remedies for the rescission.

Instruction No. 10, however, is not completely free from error. In this state, interest is recoverable from the date the payment is due under the policy. *Reliance Insurance Company of Pennsylvania v. Community Federal Savings and Loan Association,* 440 S.W.2d 929, 931 (Mo. 1969). The policy issued by the defendant contains an identical provision as noted in the *Reliance* case *supra,* at 931. It states, "the amount of loss from which this company may be liable shall be payable 60 days after proof of loss ... is received by this company...." Shelter received plaintiffs' proof of loss schedule on April 4, 1983, and hence, no interest could be awarded prior to June 3, 1983. This court adjusts the interest accordingly pursuant to Rule 84.-14.

Therefore, the judgment as entered by the trial court is affirmed in the sum of $22,400 on the policy and $4,000 in attorney fees. The interest assessed, by the jury shall be calculated from June 3, 1983, (not March 13, 1983, as the jury was instructed) to April 18, 1984, at nine percent (9%) per annum interest, pursuant to law. Judgment is therefore entered in the sum of $1,754.50 as interest from June 3, 1983, through April 18, 1984.

KENNEDY, J., concurs.

DIXON, J., dissents in separate opinion.

DIXON, Judge, dissenting.

I dissent. I cannot agree with several of the issues treated in the majority opinion.

First, I do not believe the trial court should have submitted the issue of Shel-

ter's vexatious refusal to pay on the policy to the jury, and the part of the judgment awarding attorney's fees on that basis should be reversed. There can be little doubt that the defendant insurance company had a bona fide and legitimate defense to the action. The issue of submissibility to the jury was very close. The application was made by Mrs. Crewse on behalf of both her and her husband and at her husband's direction. She signed the application after the agent had filled in answers to the questions. She and her husband are bound by the answers she acknowledged by her signature even though she did not read the application. *DeLisle v. Cape Mutual Insurance Co.,* 675 S.W.2d 97, 100 (Mo.App.1984). The majority acknowledges this is so. Mrs. Crewse knew of the *three* previous fires and she knew of her husband's bankruptcy. Shelter was falsely informed about previous fires and the bankruptcy of the husband. On the bankruptcy issue, the majority asserts that the materiality of the bankruptcy makes this a submissible issue for the jury. The assertion is made that the evidence was "that the insurance industry does not generally consider bankruptcy to be a factor in the decision in [*sic*] accepting an application for homeowner's insurance." In another place the majority states, "that other insurance companies do not find bankruptcy to be a factor when considering an application for property insurance against fire." It is very dubious that the record supports such broad statements. The issue was raised in the evidence only in the defendants' case and in the rebuttal testimony of an insur-

---

Similarly, this court cannot allow defendant in the instant case to pursue the theory of recoupment in light of the principle of election of remedies. *Davis v. Hauschild,* 243 S.W.2d 956, 959 (Mo.1951).

Furthermore, this case is readily distinguishable from *Freeman Contracting Co. v. Lefferdink,* 419 S.W.2d 266, 275 (Mo.App.1967) cited by the dissent which utilized the theory of recoupment. In *Freeman,* recoupment, as a defensive plea, was employed because the evidence did not rise to the level of a breach of contract as in a counterclaim but there was some showing of defective performance which supported a defense of recoupment. *Id.* at 275.

*See also, Forythe v. Starnes,* 554 S.W.2d 100, 107 (Mo.App.1977); *Tile Craft Products v. Colonial Properties,* 449 S.W.2d 653, 656 (Mo.1970); *Burger v. Wood,* 446 S.W.2d 436, 441, 444 (Mo. App.1969); *Shroeder v. Prince Charles,* 427 S.W.2d 414, 419–420 (Mo.1968).

In the instant case, after the assignment, either the Crewses continued to pay on the notes or they defaulted on the notes thereby accelerating the principal amount outstanding and accrued interest due for immediate payment. Hence, under this type of mortgage contract there were no varying degrees of performance as seen in *Lefferdink, supra.*

ance agent named Hutchinson. Defendants offered the testimony of Aufrenc, an underwriter for Shelter. He testified that the written underwriting rules require an agent to reject an application which discloses a bankruptcy within five years. The testimony was unequivocal that this application would have been rejected if the underwriter had known of the bankruptcy. On cross examination the witness said *he did not know* that Shelter was the only company that asked about bankruptcy and that *apparently* other companies insured regardless of bankruptcy.

Read in context, these answers only demonstrate the unwillingness of the witness to contradict the cross examiner's leading questions rather than show the witness' affirmative knowledge. The testimony of Hutchinson on this issue is as follows:

> Will you tell the ladies and gentlemen of the jury whether or not bankruptcy has anything at all to do with fire, fire insurance. [objection]
>
> .     .     .     .     .
>
> THE COURT: He can testify as to his knowledge.
>
> (Proceedings returned to open court.)
>
> Q (By Mr. Wheeler) Do you remember the question?
>
> A Give it again, please.
>
> Q Does bankruptcy have anything to do with property insurance against fire?
>
> A No.
>
> MR. VALBRACHT: I object as to the general nature of the question. It is improper. It is unlimited.
>
> THE COURT: Sustained. You can ask him concerning the companies for which he writes.
>
> Q (By Mr. Wheeler) Do the companies you write for inquire as to bankruptcy for their applications?
>
> A No.

Hutchinson admitted he was not "familiar with other companies other than the ones I am working for" and that he could not testify as to the requirements of Shelter or other companies. Hutchinson, although an agent for 18 years, did not say he had any experience with underwriting and admitted he knew nothing about the issue of bankruptcy, except that his companies did not ask about bankruptcy. In fact, the evidence does not even address the question of the underwriting policy as to bankruptcy. All that it shows is that the question is not asked. If the companies acquired knowledge of bankruptcy in another fashion, e.g. from a credit report, such information might still be considered by the underwriter as a ground for rejecting the risk.

This testimony simply does not support the broad propositions stated in the majority opinion. The submissibility issue as to the bankruptcy representation is a very close one and turns on the question of whether Hutchinson's testimony is substantial. I do not believe that it is, but the majority does. Nonetheless, the issue is certainly a viable one and the bona fides of Shelter in asserting the defense cannot be questioned.

Turning to the representations about previous fires, the majority asserts that since the agent Sides knew of the last of these fires that the issue is controlled by *DeLisle, supra.* I do not agree that *DeLisle* controls. The majority says that *DeLisle* applies, first, because there was evidence in the instant case, as in *DeLisle,* of prior knowledge of fire loss and, second, that the insured's agent completed the application in *DeLisle* and asked *no* questions. In *DeLisle,* the lack of knowledge of a third earlier fire is not the critical question. What turned the issue in *DeLisle* was the failure of the defendant insurer to present any evidence that the knowledge of previous fires was material. In fact, defendant's evidence showed that the knowledge of previous fires was only a factor to consider in accepting the coverage and that because they could not investigate the previous fires they would decline the risk. Defendant's evidence also positively showed that a loss 8 or 10 years before would not cause them to decline the risk. Thus, in *DeLisle,* there was no evidence that the third earlier fire would have rea-

sonably influenced a company to reject the risk or increase the premium.

In the present case, the issue is also what evidence exists to show the materiality of the risk. While the Shelter agent said he would not have written the policy had he known of the prior fire losses, the underwriter did not testify that such losses would inevitably result in denial of the risk, only that they would be investigated. The amount of the fire loss on the two earlier fires was not in evidence and the third loss, which was substantial, was known to the company, but not to the agent when the policy was issued. Thus, I would agree that the issue of the prior fire losses should have gone to the jury. I also agree that Mrs. Crewse's testimony that the agent thwarted further response about fire losses by telling her fire losses on motor vehicles were not relevant would make the issue of whether the answer was in *fact* untrue a jury issue. Again, while the issue is submissible, it is in no way contrived or forced factually or legally and does not show a lack of bona fides in asserting the defense.

The majority finds that the allowance of attorneys fees as a part of damages for vexatious refusal to pay pursuant to § 375.420, RSMo 1978 is justified under this evidence by the application of *DeWitt v. American Family Mutual Insurance Co.*, 667 S.W.2d 700 (Mo. banc 1984).

The general rule for submissibility of damages for vexatious refusal to pay under § 375.420 is that such damages may not be recovered if there is a bona fide defense of law or fact. "The insurer has a right, without penalty, to litigate an open question of law or disputed facts for which there is reasonable or probable cause for belief." *Cohen v. Metropolitan Life Insurance Co.*, 444 S.W.2d 498, 506 (Mo.App. 1969). *Hopkins v. North American Co. for Life and Health Insurance*, 594 S.W.2d 310, 318 (Mo.App.1980); *Lake v. Farm Bureau Mutual Insurance Co.*, 624 S.W.2d 28 (Mo.App.1981). This rule of submissibility arises from the language of the statute "without reasonable cause or excuse." If the evidence viewed as a whole shows that a genuine and bona fide defense of law or fact was present, then the refusal to pay cannot be "without reasonable cause or excuse."

*DeWitt* states an exception to the general rule. The exception in the language of *DeWitt* is as follows, "The existence of a litigable issue, either factual or legal, does not preclude a vexatious penalty where there is evidence the insurer's attitude was vexatious and recalcitrant." *DeWitt*, 667 S.W.2d at 710. The *DeWitt* court found evidence to support application of the exception in a delay in payment of mortgages, in the non-return of premiums, and in the general weakness of defendant's reason for refusal to pay. *Id.*

There is no evidence in the instant case comparable to that shown in *DeWitt*. The mortgages were paid by Shelter pursuant to its right to subrogate as was contained in the policy. The premiums were promptly and fully tendered with interest at 10%. Shelter paid the $1,500 living expense due under the policy after it was aware the defense was available. As shown above, the issue as to the viability of the defense of misrepresentation is not in doubt and the issue was a close call under the evidence. The exception stated in *DeWitt* requires proof of active bad faith that is not present here. The majority opinion is in error in asserting the agent Sides knew of the last motor vehicle fire loss. The payment of the windstorm loss mentioned in the majority opinion is immaterial absent proof Shelter knew of the misrepresentations at the time that loss was paid. There is no such evidence.

While § 375.420 serves a salutory purpose in compelling insurers to deal in good faith, it should not be so loosely construed that it operates to inhibit bona fide defenses. The court should not have submitted the issue of vexatious refusal to pay.

I also believe that the damage instruction in this case was patent error. It was the plaintiffs' theory that the provision of the policy which reads as follows:

This policy covers any private detached garage on the premises. This coverage

also includes materials and supplies located on the premises or adjacent thereto, intended for use in construction, alteration or repair of such garage.

allowed a recovery for materials on hand to construct a garage. There is no doubt that the policy so provides. The instruction directs the jury to return a verdict for "$22,-400 with interest at 9% per annum from March 13, 1983." The majority opinion concedes interest should not be accrued from March 13th but from June 3, 1983. There is also error in the amount of $22,-400. The figure is computed by plaintiffs as $15,000 for dwelling, $6,000 for unscheduled personal property, and $1,500 for appurtenant structures, less $100 deductible. There is only a smattering of evidence as to the value of the materials on hand. The proof of loss lists lumber and materials valued at $200. No witness gave any other testimony as to value. It was apparently plaintiffs' view that proof of any loss under the materials provisions triggered the $1,500 limit on appurtenant structures. I cannot agree that the policy should be read to permit a recovery for $1,500 when the plaintiffs' evidence shows that the loss was only $200. The valued policy statutes refer to the values of items in existence at the time of the coverage and should not apply to such an item as the evidence discloses in this case. While the statute might deny Shelter any right to question the value of the existing appurtenant structure, the statute should not require it to pay $1,500 for $200 worth of material. There was *no appurtenant structure* destroyed, and the valued policy statute has no application.

There is, however, an even more significant defect in the damage instruction, which when considered in the full context of the case, requires reversal. Shelter urges that the damage instruction is erroneous because it does not require the jury to credit Shelter's payment of the Crewse's mortgage indebtedness to the bank against the amount due. The effect of the present judgment is to unjustly enrich the Crewses if the claim of Shelter for repayment of the amount paid under the mortgage clause is barred.

The claim of Shelter for the payment made to the bank is barred under the compulsory counterclaim rule, Rule 55.32. The failure to assert a compulsory counterclaim bars the claim. *Knight v. M.H. Siegfried Real Estate, Inc.*, 647 S.W.2d 811, 813 (Mo. App.1982). The rule applies to set-off and recoupment as well as conventional counterclaims. *McDowell v. Schuette*, 610 S.W.2d 29, 36 (Mo.App.1980); *Standard Insulation & Window Co. v. Dorrell*, 309 S.W.2d 701, 704 (Mo.App.1958). The claim of Shelter to credit for payment made under the mortgage clause is not a conventional counterclaim. It is a form of recoupment. Recoupment "goes to mitigation or extinguishment of plaintiff's damages but permits of no affirmative judgment for the defendant." *Edmonds v. Stratton*, 457 S.W.2d 228, 232 (Mo.App.1970). "In its strict and literal sense it is a purely defensive matter...." *Freeman Contracting Co. v. Lefferdink*, 419 S.W.2d 266, 275 (Mo. App.1967). It is distinguishable from a conventional or affirmative counterclaim because recoupment may not provide a basis for judgment against the plaintiff while a counterclaim can. *Id.* It is unlike a set-off which must arise from a separate and distinct obligation. The modern pleading authorities recognize that the theory of recoupment is available as a purely defensive plea or as a counterclaim in terms of the manner it is presented or instructed upon. The recoupment by Shelter is within Rule 55.32 as a compulsory recoupment both by the definition of recoupment itself and by the definition of transaction under the Rules. "Transaction," under Rule 55.-32, is to be applied in its broadest sense to serve the purpose of the rule in bringing all logically related claims into a single litigation, and a defendant in a contract action is required to present all claims he has against a plaintiff arising out of the contract. *State ex rel. J.E. Dunn, Jr. & Associates, Inc. v. Schoenlaub*, 668 S.W.2d 72, 75 (Mo. banc 1984). Shelter's right of recoupment arose out of the insurance contract upon which plaintiffs' suit was based. The transaction between the parties was

the contract and the recoupment was part of the transaction.

In this case the contract between the parties provided an additional right to Shelter. By the terms of the mortgage clause, Shelter was bound to pay the bank even if a defense existed as to the insured. *De-Witt*, 667 S.W.2d at 710; *Weekly v. Missouri Property Insurance Placement Facility*, 538 S.W.2d 375, 379 (Mo.App.1976). The mortgage clause, however, also permitted Shelter in any case where liability as to the insured was contested to take an assignment and be subrogated to the bank's rights against the insured. That is what occurred in this case—the notes show that they were assigned to Shelter. This right under the policy gave rise to the affirmative counterclaim which Shelter submitted. The claim in tort which that counterclaim submitted did not by the election of remedies bar the simultaneous submission of the theory of recoupment against plaintiffs' claim under the contract. *Clayton Brokerage Co. v. Pilla*, 632 S.W.2d 300, 305 (Mo.App.1982), because those remedies are not inconsistent. The theories are alternative. If plaintiff prevails on the insurance contract, defendant is entitled to recoupment; if plaintiff loses on the contract action, the defendant can still prevail on the affirmative counterclaim for fraud in the inducement of the contract and the resultant damage. The instant case is analogous to *Freeman Contracting Co. v. Lefferdink, supra.* In *Lefferdink*, plaintiff sued on a contract to repair a foundation. Defendant counterclaimed in tort, contending the work was negligently done, damaging the premises. *Lefferdink*, 419 S.W.2d at 270. Plaintiff prevailed and defendant's counterclaim was denied in the trial court. On appeal the court found defendant had failed to prove negligence, *Id.* at 277, but that the damages shown entitled him to recoupment on plaintiff's claim. *Id.* 275–276. The case was reversed for a new trial on plaintiff's claim.

The instant case should also be reversed for a new trial on the plaintiffs' claim with appropriate instruction on the theory of recoupment. The judgment on the submitted counterclaim is final; the defendant does not contend otherwise. I, therefore, dissent from the majority opinion affirming the plaintiffs' judgment.