**Jonathan HENSLEY, Plaintiff–Respondent,**

v.

**SHELTER MUTUAL INSURANCE COMPANY, Defendant–Appellant.**

**No. 27094.**

Missouri Court of Appeals,
Southern District,
Division Two.

Jan. 4, 2007.

Robert L. Brady, T. Michael Ward, and Teresa M. Young, Brown & James, P.C., Springfield, MO, for appellant.

Wendell L. Hoskins II, Caruthersville, MO, for respondent.

GARY W. LYNCH, Judge.

Shelter Mutual Insurance Company ("Shelter") appeals the judgment entered by the trial court upon a jury verdict in favor of Respondent Jonathan Hensley ("Jonathan")[1] for penalty and attorney fees pursuant to § 375.420,[2] commonly referred to as the vexatious refusal to pay statute. Shelter asserts that Jonathan failed to make a submissible case to support such an award. Shelter also claims trial court error in its failure to apply sums deposited by Shelter into the court's registry to the damage instruction submitted to the jury and in the judgment entered after the jury verdict. Finding no merit to any of Shelter's claims, we affirm the judgment. We remand the case to the trial court to conduct a hearing to determine the reasonableness of Jonathan's requested attorney fees on appeal and to enter judgment accordingly.

### 1) *Factual Background*

Viewed in the light most favorable to the jury verdict, the facts of the case are as follows. Jonathan and his wife, Juanita, purchased and moved into a one-story brick home with an attached two-car garage near Steele, Missouri, in April of 2000. Most of the purchase price was financed by a mortgage obtained through Cendant Mortgage Corporation ("Cendant"). Also at the time of purchase, Jonathan and Juanita obtained a homeowners insurance policy from Shelter. This home was destroyed by fire in the early morning hours of February 3, 2003. At that time, all payments on the Cendant mortgage were current, and the Shelter policy was in full force and effect.

In October of 2001, Jonathan and Juanita separated. Juanita removed some personal property from the home where Jonathan continued to reside in order to set up her new residence in Steele. Over a year later in December 2002, Juanita filed for dissolution of marriage. This precipitated a series of ongoing discussions between Jonathan and Juanita regarding the division of their property. During the middle of January 2003, Juanita increased her property division demand to include a part of Jonathan's 401(k) plan from his employment and some of the personal property located in the home where Jonathan continued to reside.

Jonathan's birthday was on Wednesday, January 29, 2003. His friend Jim Ed Morton's birthday was on Saturday, February 1, 2003. Because Jonathan was working

---

1. Because Respondent's wife, Juanita Hensley, is also a party to this action, we will refer to each of them by their first names in order avoid any confusion. No disrespect is intended.

2. References to statutes are to RSMo 2000, unless otherwise indicated.

on that Wednesday through Saturday, he and Morton agreed to celebrate their birthdays beginning with a party at Jonathan's house [3] on that Saturday evening. Later in the evening, Jonathan and some friends left the party and continued their drinking and celebration at a couple of different bars. Jonathan arrived home in the early morning hours of February 2 and went to sleep.

When Jonathan awoke that morning, he found his house in disarray from the party the night before. He picked up most of the trash and then left for a bar in Steele called Ms. Linda's to continue his birthday celebration. Several of his friends showed up at Ms. Linda's, including Jeff Jacks. Sometime during that afternoon, Jonathan rode with Jacks from Ms. Linda's over to a bar named High Rollers in Caruthersville.

Meanwhile, around 12:30 p.m., Juanita went over to Jonathan's house where she left Jonathan a note reiterating her previous demand regarding the property division. As she left, she gathered up a computer hard drive and a box of pictures from the home and took them with her.

At 4:00 p.m., the Steele Fire Department responded to a call indicating a fire at Jonathan's home. The fire department extinguished a fire in the kitchen and dining area that originated from the top of the stove. Before leaving the scene, the fire department checked the attic for any indication of fire and found none. They also disconnected the utilities to the house. While on the scene, the fire chief did not notice any signs that any personal property was missing from the house.

A friend of Jonathan drove over to High Rollers in Caruthersville and informed Jonathan that his house was on fire. Jacks immediately took Jonathan directly home. When they arrived, the firemen were rolling up their hoses and getting ready to leave. Jonathan walked though the house and observed that the kitchen and dinning room were destroyed and that the rest of the house had sustained substantial smoke damage. He determined he could not stay in the house.

While Jonathan was inspecting the fire damage, his girlfriend, Danette Jones, arrived and parked her vehicle in front of the garage. Jones then drove Jonathan in his truck over to his friend Dewayne Williams' house. Later that evening, Jonathan and Jones decided to go to Jones' house in Osceola [4] to spend the night.

Meanwhile, around 9:00 to 9:30 p.m., Juanita and her friend, Michelle Cook, went to Jonathan's house. While she was at the house, she observed Jonathan's truck pull into the driveway in front of the garage next to Jones' car.

On their way from Dewayne Williams' house to Jones' residence in Osceola, Jonathan and Jones stopped at Jonathan's house to retrieve her children's backpacks from her car for school the next morning. Jones parked Jonathan's truck in front of the garage next to her car, retrieved the backpacks, and left for her home. Neither Jonathan nor Jones entered the house at this time. Jonathan stayed at Jones' house in Osceola the rest of that night.

Around 5:30 a.m. the next morning, February 3, 2003, while on her way to work,

3. This property was owned at the time of the loss by Jonathan and Juanita Hensley as tenants by the entireties. It is referred to in this opinion as "Jonathan's home" or "Jonathan's house" solely for the purpose of identification as the property where Jonathan was residing and which is the subject of the claimed loss.

4. While the record is silent on this issue, it appears that the Jones' residence is located in Osceola, Arkansas and not Osceola, Missouri.

Sheila Pruitt observed a dark-colored pickup truck backing out of the driveway to Jonathan's house. This driveway is shared with Jonathan's neighbor, Jerry Collins. As of this date, Jerry Collins drove a dark red pickup truck.

At 5:45 a.m. that morning, the Steele Fire Department received a call reporting a fire at Jonathan's home. When the fire department arrived on the scene, the house was pretty well engulfed by fire, and the roof was caving in. Jones' car was still parked in front of the garage. Jonathan had nothing to do with causing this fire loss.

Later in the morning, Jonathan received a call at Jones' house from Jim Ed Morton advising him to get over to Jonathan's house because it had burned down. Jonathan and Jones drove his truck over to the house and arrived sometime between 9:15 and 11:00 a.m. The firefighters had all departed by this time. Except for three exterior garage walls, the garage roof, and some other portions of exterior brick walls, the house was completely burned to the ground.

Around 11:00 a.m., Juanita arrived at the fire scene. She observed that Jonathan was visibly upset, crying, and saying how he loved everything. Jonathan lamented the loss of a set of china that had belonged to his mother who had passed away when he was ten years old. The family bible was also destroyed in the fire.

While Jonathan was at the scene that morning, he had to call the fire department to come back to the house to put out a rekindle of the fire. During the next two days, the fire department was called out two additional times to extinguish two other rekindles of the fire.

Shortly after the second fire, John Asmus, a claims representative from Shelter, contacted Jonathan. Asmus gave him a check for $2,000.00 as an advance for the purchase of "clothes and stuff." Asmus also asked Jonathan to diagram the interior layout of the house. This diagram as drawn by Jonathan showed an interior storage room located immediately south of the attached garage; a bathroom area with walk-in closet immediately south of the storage room; the master bedroom immediately south of the bathroom and closet; and the living room, which contained the front door, immediately south of the master bedroom.

The fire department did not call upon the State Fire Marshal to investigate either fire. Shelter hired Chris Silman to investigate the cause and origin of the fires. However, if Silman determined either fire to have been intentionally set, he was not directed or asked by Shelter to make any determination as to who set the fire.

Silman made one visit to the fire scene on February 5, 2003. While Silman was on the scene that day, the fire department arrived for the final time to extinguish a rekindle of the fire. As part of his investigation, Silman physically observed the scene, took several pictures of the scene, made a hand-drawn diagram of the scene, and acquired five samples of debris from the scene to be submitted for testing to determine the presence of an accelerant.

Silman found no evidence of any missing personal property. He observed no pour patterns or burn patterns anywhere in the house. All of the debris samples he extracted from the scene, except for sample number two, tested negative for the presence of an accelerant. His hand-drawn diagram of the scene was based solely upon physical evidence at the scene with no input from anyone else. He did not take any measurements at the scene, noting that his diagram was not drawn to scale. He did not know the dimensions of any of

the interior rooms of the house or exactly where any of the interior walls were located before the fire and did not ask anyone for assistance in making such determinations. He made a notation of the approximate location where each of the five debris samples was taken on his hand-drawn diagram, which erroneously showed the master bedroom as being located immediately adjacent to the south wall of the garage. This hand-drawn diagram shows sample number two as being taken from the approximate center of the master bedroom as erroneously shown on the diagram.

Silman's evidence log indicated that sample number two was taken "between front door and garage." The computer-printed diagram made by Silman and submitted to Shelter with his final report, which also erroneously depicted the master bedroom as being located immediately adjacent to the south wall of the garage, indicated that sample number two was taken from the southeast corner of the master bedroom. One of the pictures of the fire scene taken by Silman shows sample number two as having been taken from the location of the interior storage room where Jonathan regularly stored lawn mower gas in a can. Silman's investigation did not reveal and he was not aware that a storage room existed between the garage and the master bedroom or that Jonathan kept a five-gallon can of gas in the storage room. Silman admitted that the existence of an interior storage room, walk-in closet, and bathroom area between the garage and the master bedroom cast doubt upon his testimony that sample number two came from the master bedroom.

After concluding his on-site investigation, Silman tracked down Sheila Pruitt and obtained her statement regarding her observation of a dark-colored pickup truck backing out of the driveway at 5:30 a.m. on the morning of the fire. However, after obtaining this statement, Silman never talked to the Collinses, Jonathan's next-door neighbors who lived within one hundred feet of Jonathan's house and who shared the driveway in common with him. Silman did not take any steps to find out what kind of vehicles the Collinses drove or what time they got up and left for work on the morning of the fire.

Silman spoke by telephone with Jonathan three days later, on February 8. Jonathan informed him that he had spent the night of February 2 in Jones' house in Osceola. Silman took no further steps to confirm or disprove Jonathan's alibi. Silman never asked Jonathan for a copy of the diagram of the house that Jonathan made for Asmus.

On February 24, 2003, Asmus faxed Cendant an information release authorization and a request on Shelter letterhead that Cendant "fax me a copy of the original loan amount, purchase price, outstanding balance, and payment history" for the mortgage held by Cendant on the Hensley property. By return fax that day, Cendant provided Asmus with the following information:

Date of Loan: 04-14-00
Interest Rate: 8.25000
Original Loan Amount: $79246
Total Payment: $766.33
Number of payment received 15 or more days after the due date in the last 12 months: 1.

Principal Balance: $77176.41
Maturity Date: 05-30

Next Payment Due: 03-01-03

Jonathan and Juanita signed a sworn statement and proof of loss on March 28, 2003, and submitted it to Shelter. Shelter

received it on April 2, 2003. Around this same time, Jonathan inquired of Asmus as to why Shelter had not paid off the mortgage held by Cendant. Asmus replied that Jonathan might as well get a lawyer because Shelter was not going to pay the house off. Juanita submitted to an examination under oath by Shelter on May 8, 2003, and Jonathan submitted to his on July 29, 2003. Additional facts will be provided further hereafter as necessary to aid in the discussion of the points raised by Shelter.

## 2) *Procedural Background*

Jonathan filed his original petition against Shelter on September 9, 2003, seeking damages under the policy and a penalty and attorney fees for vexatious refusal to pay. On October 14, 2003, Shelter filed its answer to Jonathan's petition denying liability on the policy "because the fire was set by [Jonathan], or at his direction, with his knowledge and consent, and, as such, coverage is specifically excluded." Also on October 14, 2003, Shelter filed a counterclaim for declaratory judgment against Jonathan, alleging that as a result of the fire "it has become obligated to make payment to [Cendant] and [Juanita]," and praying for an "order that [Shelter] is entitled to reimbursement from [Jonathan] for … amounts paid to [Cendant] and [Juanita]."

In May 2004, Jonathan filed his second amended petition in which, among other things, he amended the original cause of action, now denominated as Count I, with the additional allegation that "Defendant Shelter, by and through its agents and employees, failed, refused and neglected to pay the insurable interest of the mortgagee, [Cendant], despite the numerous requests of [Jonathan] and counsel." In its answer to the second amended petition, Shelter denied this allegation. The second amended petition also added a second count joining Juanita and Cendant as additional defendants and seeking a declaratory judgment as to the parties' respective rights in and to the policy proceeds.

Richard West, the designated corporate representative of Shelter, gave his deposition on June 17, 2004. During this deposition, he acknowledged that Shelter owed Cendant for the mortgage on the property.

On August 31, 2004, Jonathan filed a Motion for Preliminary Injunction, seeking to enjoin Shelter from paying Cendant any sums in excess of $77,176, the principal balance of the mortgage as of the date of the fire, "until such time as the respective rights and obligations of the parties thereto may be finally adjudicated." This motion was never ruled on by the trial court.

On that same day, Jonathan also filed a Motion for Preliminary Injunction seeking to enjoin Shelter from paying directly to Juanita as an "innocent coinsured" any proceeds under the policy.[5] The trial court sustained this motion on October 13, 2004 and enjoined Shelter from paying directly to Juanita as an "innocent coinsured" pursuant to § 375.1312.5 any proceeds under the policy "until such time as the respective rights and obligations of the parties hereto may be finally adjudicated."[6] The trial court also ordered Shelter

---

5. Section 375.1312.1(3) defines an "innocent coinsured" as "an insured who did not cooperate in or contribute to the creation of a property loss and the loss arose out of a pattern of domestic violence[.]"

6. Section 375.1312.5 provides:

If an innocent coinsured files a police report and completes a sworn affidavit for the insurer that indicates both the cause of the loss and a pledge to cooperate in any criminal prosecution of the person committing the act causing the loss, then no insurer shall deny payment to an innocent coin-

to "pay any sum it deems itself liable to pay to [Juanita] pursuant to [§ 375.1312.5] into the registry of this Court."

On October 25, 2004, Shelter filed a motion to deposit funds into the registry of the court. In this motion, Shelter alleged that:

> it is liable to [Juanita] and [Cendant] under the insurance policy as follows: (1) $31,435.00 due and owing [Juanita] as an "innocent co-insured" and (2) $83,100.00 (the dwelling policy limit) due and owing [Cendant] as payment for the mortgage note.
>
> . . . .
>
> [Shelter] now moves this Court for an Order allowing [Shelter] to deposit the aforesaid amounts into the Registry of the Court until such time as the respective rights and obligations of the parties hereto may be finally adjudicated.

On that same date, the trial court, with the consent of all parties, entered an order granting Shelter's motion as prayed, and pursuant to this order, Shelter deposited the indicated amounts into the registry of the court.

◼ Apparently sometime during January or February of 2005, Jonathan, Juanita, Shelter, and Cendant entered into a settlement agreement related to the $83,100.00 in dwelling coverage under the policy.[7] This agreement provided that: (1) Jonathan, Juanita, and Shelter would immediately jointly present a consent order to the Court to pay to Cendant the $83,100.00 previously deposited with the Court by Shelter; (2) upon receipt of such payment, Cendant would (a) immediately pay Jonathan and Juanita jointly the sum of $4,100.00, (b) release and discharge of record its mortgage lien against the property, and (c) report Jonathan and Juanita's account with them to credit bureaus as "paid as agreed"; and (3) Jonathan, Juanita, and Shelter would execute and file a stipulation of dismissal with prejudice of Cendant from the lawsuit. The settlement agreement also contained mutual releases among all parties, but specifically reserved Jonathan's and Juanita's rights to seek:

> any and all damages sought from Shelter or which may be sought from Shelter through said litigation other than the $83,100.00 in Dwelling coverage under the subject policy, including but not limited to those amounts allegedly due under the Policy for Personal Property, Additional Living Expenses and Debris Removal, and any consequential damages allegedly due for the alleged breach of the Policy, statutory exemplary damages and reasonable attorneys' fees and

sured on a property loss claim due to any policy provision that excludes coverage for intentional acts. Payment to the innocent coinsured may be limited to such innocent coinsured's ownership interest in the property as reduced by any payment to a mortgagor or other secured interest; however, insurers shall not be required to make any subsequent payment to any other insured for the part of any loss for which the innocent coinsured has received payment. An insurer making payment to an insured shall have all rights of subrogation to recover against the perpetrator of the loss.

7. While the record on appeal contains allegations of the existence of such an agreement and its terms as disclosed in an unexecuted copy of the purported agreement, it does not support that an agreement was actually reached between the parties. However, in a response filed jointly by Jonathan and Shelter to an Order to Show Cause issued by our court, the parties jointly stated that a settlement was in fact reached in accordance with the unsigned settlement agreement contained in the record on appeal. Where all parties concede the truth of a factual assertion, we may consider the fact as though it appeared in the record. See Quinton v. Unger, 199 S.W.3d 882, 885 n. 3 (Mo.App.2006); Jones v. Fireman's Fund Ins. Co., 792 S.W.2d 404, 408 (Mo.App.1990).

costs pursuant to [§ 375.420], and pre-judgment interest on any amounts alleg-edly due, including but not limited to prejudgment interest on the $83,100.00 in Dwelling coverage paid hereunder and accruing prior to its deposit into the registry of the Circuit Court of Pemiscot County, Missouri, on or about October 25, 2004.

For some reason not disclosed in the rec-ord, this settlement agreement was not presented or communicated to the trial court or otherwise consummated until af-ter the jury trial, which occurred on Feb-ruary 3 and 5, 2005, concluded.[8]

The case was tried and submitted to the jury on Count I of Jonathan's petition. The jury entered a verdict in favor of Jonathan in the amount of $158,970.00 on the policy, $22,367.03 for interest, $15,713.11 for penalty, and $43,477.08 for attorney fees, for a total amount of $240,527.22. The jury gratuitously indicat-ed on the verdict form that the amount awarded on the policy was derived by awarding $83,100 for the dwelling, $58,170 for the personal property, $15,000 for addi-tional living expense, $4,700.00 for debris removal, $500 for fire department services, less the $500 deductible, and less the $2,000.00 advance.

On February 14, 2004, Jonathan filed a motion to enforce the Cendant settlement agreement. Three days later, the court entered an order directing the clerk to immediately disburse $83,100 to Cendant, which the clerk did the next day.

A month later on March 14, 2005, the court entered a judgment in accordance with the jury verdict in favor of Jonathan and against Shelter in the amount of $240,527.22. No mention was made in this judgment of Count II of Jonathan's second amended petition for declaratory judgment or Shelter's counterclaim for declaratory judgment. Shelter filed its post-trial mo-tions on April 12, 2005, which included a Motion to Amend the Judgment, Motion for Remittitur, and for Other Post–Trial Relief; a Motion for Judgment Notwith-standing the Verdict; and a Motion for New Trial.

On April 29, 2005, Juanita filed a Motion to Enforce Judgment, alleging that on April 22, 2005 a hearing was held on her petition for dissolution of marriage and that the dissolution court "ordered that [Juanita] was entitled to $31,435 that had been deposited into the registry of this court on or about October 25, 2004." The motion further alleged that neither Jona-than nor Shelter had an objection to the motion. It prayed for an order to the clerk to disburse the funds. On May 2, 2005, the court entered such an order, and the clerk accordingly dispersed the funds.

On June 23, 2005, the trial court denied all of Shelter's post-trial motions, and this appeal followed. After the Notice of Ap-peal was filed, Jonathan moved in the trial court for leave of court to dismiss Count II

---

**8.** After the trial, Jonathan filed a Motion to Enforce Release and Settlement Agreement on February 14, 2005, which incorporated a copy of a purported agreement showing exe-cution only by Jonathan and which alleged that all parties had executed the agreement before the commencement of the trial on Feb-ruary 3, 2005, with the understanding that Shelter, being the last party to execute the agreement, would present it to the court be-fore the trial started on that date. However, in Shelter's Motion to Amend the Judgment, filed on April 12, 2005, Shelter refers to this agreement as only being executed by Jona-than. Regardless of this confusion, the rec-ord is completely void of any evidence that the trial court was made aware of any such agreement before the filing of Jonathan's Mo-tion to Enforce Release and Settlement Agree-ment, which occurred nine days after the trial concluded.

of his petition seeking a declaratory judgment. The court, apparently without objection by Shelter, sustained this motion and entered its judgment and order dismissing Count II of the second amended petition with prejudice. The trial court also entered a judgment in favor of Jonathan and against Shelter on Shelter's counterclaim for declaratory judgment.

### 3) *Point I—Sufficiency of Evidence to Submit Vexatious Refusal to Pay Claim*

In its first point on appeal, Shelter contends that the trial court erred in failing to grant its motion for judgment notwithstanding the verdict ("JNOV") because Jonathan failed to present sufficient evidence to support submission to the jury of his claim for a penalty and attorney fees for Shelter's vexatious refusal to pay.

■ Our Supreme Court has recently addressed the standard of review on such a claim of error and noted:

> The standard of review of denial of a JNOV is essentially the same as for review of denial of a motion for directed verdict. A case may not be submitted unless each and every fact essential to liability is predicated upon legal and substantial evidence. In determining whether the evidence was sufficient to support the jury's verdict, the evidence is viewed in the light most favorable to the result reached by the jury, giving the plaintiff the benefit of all reasonable inferences and disregarding evidence and inferences that conflict with that verdict. This Court will reverse the jury's verdict for insufficient evidence only where there is a complete absence of probative fact to support the jury's conclusion. (Internal citations omitted).

*Dhyne v. State Farm Fire & Cas. Co.,* 188 S.W.3d 454, 456–57 (Mo. banc 2006).

The elements of a claim for vexatious refusal to pay are derived from § 375.420, which states:

> In any action against any insurance company to recover the amount of any loss under a policy of automobile, fire, cyclone, lightning, life, health, accident, employers' liability, burglary, theft, embezzlement, fidelity, indemnity, marine or other insurance except automobile liability insurance, if it appears from the evidence that such company has refused to pay such loss without reasonable cause or excuse, the court or jury may, in addition to the amount thereof and interest, allow the plaintiff damages not to exceed twenty percent of the first fifteen hundred dollars of the loss, and ten percent of the amount of the loss in excess of fifteen hundred dollars and a reasonable attorney's fee; and the court shall enter judgment for the aggregate sum found in the verdict.

Therefore, in order to submit his claim for vexatious refusal to pay to the jury, Jonathan had to prove that: (1) he had an insurance policy with Shelter; (2) Shelter refused to pay; and (3) Shelter's refusal was without reasonable cause or excuse. *Dhyne,* 188 S.W.3d at 457. The sufficiency of the evidence on the first two elements is not challenged by Shelter. Rather, Shelter argues that Jonathan failed to present sufficient evidence to prove that Shelter's refusal to pay was without reasonable cause or excuse and that the trial court thereby erred in denying it JNOV.

Before beginning our inquiry as to whether substantial evidence exists in the record to support a finding that Shelter's refusal to pay was *without* reasonable cause or excuse, we must address an issue repeatedly raised by Shelter in its brief. In its point relied on, Shelter supports its assignment of trial court error by stating, "*Shelter possessed reasonable cause* to re-

fuse payment to [Jonathan] based on its investigation." In section A of this point, Shelter states, "As a matter of law, Shelter had an absolute right to litigate the open question as to whether [Jonathan] had set the fire that destroyed the insured property—without incurring liability for the statutory vexatious-refusal-to-pay penalties—because *Shelter possessed a reasonable belief* that [Jonathan] had set the fire." The heading of section C of this point states, "An *insurer possessing a reasonable belief* that the insured intentionally destroyed the insured property has the right to litigate the question without incurring liability for penalties under the vexatious-refusal-to-pay statute." Section D of this point states, "*Shelter had reasonable cause* to refuse to pay [Jonathan] for the loss based on its investigation[.]" Under section D, Shelter argues: "*Shelter's investigation demonstrated* [,]" and "[t]he facts known to Shelter that underlie *its reasonable cause to believe* that [Jonathan] had intentionally set the fire include[,]" and "[t]hese facts demonstrate that *Shelter had reasonable cause* to refuse to pay[.]" In section D, Shelter expends four pages of its brief listing all of the facts in the record supporting the reasonableness of its cause to believe that Jonathan had intentionally set the fire. By framing and arguing the issue in this manner, Shelter sets itself free from the applicable standard of review. Instead of viewing the evidence in the light most favorable to Jonathan's claim that Shelter's refusal to pay was *without* reasonable cause or excuse, and disregarding all contrary evidence to such claim, Shelter now argues from all of the facts in the record, even those that conflict with the verdict, that it had reasonable cause or excuse to refuse to pay. Shelter acknowledges this newfound freedom by boldly stating, without citation: "If the evidence *viewed as a whole* shows that a genuine and good faith defense was present, then the insurer's refusal cannot be without reasonable cause or excuse." (Emphasis added). Unfortunately for Shelter, we do not have such freedom and are confined in our analysis to the applicable standard of review. *Id.* at 456–57.

■ In reviewing the record in the light most favorable to the verdict and disregarding all evidence contrary to the verdict, we are guided by certain legal principals. "When there is an open question of law or fact the insurer may insist upon a judicial determination of those questions without being penalized." *Hocker Oil Co., Inc. v. Barker–Phillips–Jackson, Inc.*, 997 S.W.2d 510, 523 (Mo.App. 1999) (quoting *Wood v. Safeco Ins. Co. of America*, 980 S.W.2d 43, 55 (Mo.App. 1998)). The existence of a litigable issue, however, does not preclude a vexatious penalty where there is evidence the insurer's attitude was vexatious and recalcitrant. *DeWitt v. American Family Mut. Ins. Co.*, 667 S.W.2d 700, 710 (Mo. banc 1984); *Kimpton v. Spellman*, 351 Mo. 674, 173 S.W.2d 886, 893 (1943); *Hocker Oil Co., Inc.*, 997 S.W.2d at 523; *Berry v. Fed. Kemper Ins. Co.*, 621 S.W.2d 948, 953–54 (Mo.App.1981); *Still v. Travelers Indemnity Co.*, 374 S.W.2d 95, 103 (Mo.1963); *Lemay Ferry Bank v. New Amsterdam Cas. Co.*, 347 Mo. 793, 149 S.W.2d 328, 331 (1941). "Direct and specific evidence to show vexatious refusal is not required, the jury may find vexatious delay upon a general survey and a consideration of the whole testimony and all the facts and circumstances in connection with the case." *DeWitt*, 667 S.W.2d at 710. These last two stated principals recognize the burden placed upon a plaintiff associated with affirmatively proving a negative, i.e. refusal to pay *without* reasonable cause or excuse.

Several factual scenarios have been recognized as indicative of a vexatious and recalcitrant attitude. They include: (1)

the insurer's delay or refusal to pay the mortgagee,[9] *id.;* (2) the insurer's denial of liability without stating any ground for denial, *Allen v. State Farm Mut. Auto. Ins. Co.,* 753 S.W.2d 616, 620 (Mo.App. 1988) and *Berry v. Federal Kemper Ins. Co.,* 621 S.W.2d 948, 954 (Mo.App.1981); (3) the inadequacy of the insurer's investigation of the claim, *DeWitt,* 667 S.W.2d at 710; (4) the explanation given by the insurer for denying the claim, *id.;* and (5) the insurer's disparate treatment of coinsureds, *Russell v. Farmers & Merchants Ins. Co.,* 834 S.W.2d 209, 222 (Mo.App. 1992).

■ The instant case involves an open factual question, as demonstrated by the trial court's submission to the jury of Shelter's affirmative defense instruction. The trial court concluded that the evidence, viewed in the light most favorable to Shelter and disregarding any contrary evidence, supported such submission. *Wilkes v. Group Underwriters Mutual,* 715 S.W.2d 308, 310 (Mo.App.1986). Shelter was entitled to litigate this issue without penalty, unless that open question was the product of a vexatious and recalcitrant attitude. *See DeWitt,* 667 S.W.2d at 710; *Kimpton,* 173 S.W.2d at 893; *Hocker Oil Co., Inc.,* 997 S.W.2d at 523; *Berry,* 621 S.W.2d at 953–54; *Still,* 374 S.W.2d at 103; *Lemay Ferry Bank,* 149 S.W.2d at 331. Therefore, our inquiry will focus upon whether there is any substantial evidence in the record to support that the reasons

Shelter had for not paying was the result of such an attitude. We discern five areas in which the evidence supports a determination that Shelter demonstrated a vexatious and recalcitrant attitude in its refusal to pay the claim.

### (a) *Refusal to pay Cendant*

The policy of insurance in this case provides:

> Loss, if any, under this policy shall be payable to the mortgagee ..., as interests may appear, under all present or future mortgages upon the property herein described in which the aforesaid may have an interest as mortgagee (or trustee), in order of precedence of said mortgages, and this insurance, as to the interest of the mortgagee (or trustee) only therein, shall not be invalidated by any act or neglect of the mortgagor or owner of the within described property[.]

Cendant was shown on the declarations page of the policy as a mortgagee on the property. Thus, Shelter was aware of Cendant's mortgage on the property as of the date of the fire. Shelter had a policy obligation to pay Cendant as of that date, but failed to do so. *Charter Bank of Boonville v. Shelter Gen. Ins.,* 664 S.W.2d 44, 47 (Mo.App.1984).

On February 24, 2003, Shelter's claims representative Asmus made an inquiry of Cendant and obtained in response to that

---

**9.** In its Reply Brief, Shelter asserts, without citation: "As a matter of law, an insurer's mere delay in paying a mortgagee is insufficient to sustain a vexatious claim." We would be inclined to consider this misstatement as a mere failure to read and consider the holding in *DeWitt.* However, the very next sentence in the brief cites *DeWitt* for the proposition that "[a]bsent in this case is any evidence that Shelter's delay in paying Cendant was either willful or without cause or excuse." *DeWitt,* likewise, does not support

this statement. In that case, the almost seven-month delay in paying the first mortgage was due to a "mistake," no explanation was given for the almost nine-month delay in paying the second mortgage, and the third mortgage remained unpaid at the time of trial, also without explanation. Here, Shelter's unexplained delay in paying Cendant exceeded twenty months before it paid the funds into the court's registry. Cendant did not actually receive payment until more that two years after the fire.

inquiry confirmation of Cendant's interest in the property and the amount of the debt. However, even after receiving this information on that date, Shelter refused to pay Cendant.

Around the first part of April, two months after the fire, Shelter's claims representative Asmus told Jonathan that he might as well get a lawyer, because Shelter was not going to pay off the house. The jury could have reasonably inferred that Shelter made the decision at this time not to pay Cendant, even though it had an absolute policy obligation to do so.

On October 14, 2003, Shelter filed its counterclaim against Jonathan, acknowledging that it was obligated to pay Cendant, and sought a judgment for reimbursement for such payment from Jonathan. Yet Shelter continued to refuse to pay Cendant.

In May 2004, Jonathan filed his second amended petition, alleging that Shelter had failed and refused to pay Cendant. Shelter inexplicitly denied this allegation in its answer, but still had not paid and did not pay Cendant.

On June 17, 2004, the corporate representative of Shelter acknowledged in his deposition that Shelter owed Cendant on the mortgage. However, Shelter continued to refuse to pay this obligation.

During this entire time period, interest continued to accrue on the underlying promissory note, such that the Cendant payoff grew to in excess of $89,000. The payoff had long since exceeded the extent of Shelter's dwelling coverage ($83,100) under the policy, which was its maximum exposure. Jonathan was sent numerous payment demand letters from Cendant on

this burgeoning debt, including a threat from Cendant to foreclose on the property for nonpayment.

Finally, in August 2004, Shelter indicated that it was going to pay Cendant the entire dwelling coverage of $83,100 under the policy, thereby practically denying Jonathan any chance of recovering any equity in the dwelling under the policy. In an attempt to preserve such a recovery, Jonathan filed a motion seeking to enjoin Shelter from paying Cendant any policy proceeds *in excess of* $77,176.41, the principal balance due Cendant on the day of the fire. Shelter's response to this motion was to file a motion requesting leave of court to pay the *entire* dwelling coverage into the court's registry. Once again, Shelter refused to pay Cendant the $77,176.41 it knew it was obligated to pay.

As of the date of trial, the obligation owed Cendant still remained unpaid. There is no evidence in the record which was presented to the jury providing any explanation why Shelter refused to pay Cendant.[10]

All of the above-described actions of Shelter surrounding its refusal to pay Cendant constitute substantial evidence of its vexatious and recalcitrant attitude and thereby support the submission to the jury of its refusal to pay without reasonable cause or excuse. *DeWitt,* 667 S.W.2d at 710.

**(b) Denial of liability without stating any ground for denial**

Approximately two months after the fire, Shelter's claims representative Asmus told Jonathan: "You might as well get a lawyer because Shelter was not going to pay the house off." Viewed in the light

---

10. In its Reply Brief, Shelter points us to parts of Richard West's deposition taken on June 17, 2004, for a purported explanation for the delay in paying Cendant. However, none of the referenced parts of this deposition were offered or admitted into evidence and, therefore, were not before the trial court for the jury to consider.

most favorable to the verdict, the jury could have concluded that Shelter denied any liability at this time. However, no grounds were given to Jonathan as to why Shelter was not going to pay. This denial without explanation is substantial evidence of a vexatious and recalcitrant attitude. *Allen,* 753 S.W.2d at 620; *Berry,* 621 S.W.2d at 954.

### (c) Inadequacies in the investigation of the claim

Viewing the evidence in the light most favorable to the verdict and disregarding all contrary evidence, there was substantial evidence that the jury could have reasonably concluded that Shelter's investigation of the claim was inadequate. First, even though Shelter was aware of Jonathan's claimed alibi on the morning of February 3, 2003 and witnesses who could corroborate that alibi, Shelter took no action to investigate Jonathan's alibi. Shelter never contacted Danette Jones to elicit any information from her or her children which would either confirm or call into question Jonathan's statement of his whereabouts on that morning.

Second, Shelter failed to investigate the possibility that the dark-colored pickup truck that Sheila Pruitt observed backing out of the driveway at 5:30 a.m. on February 3, 2003, could have been driven by someone other than Jonathan and that that person may have had a legitimate reason to be backing out of the driveway at that time. This inadequacy in the investigation is highlighted by the fact that the Collinses, Jonathan's next-door neighbors, shared the driveway with Jonathan and drove a dark red pickup truck. Silman, Shelter's investigator, was on the scene and observed the driveway. He could have very easily contacted and interviewed the Collinses, who live within one hundred feet of the fire scene.

Third, Shelter failed to adequately determine the location within the home from which debris sample number two was extracted. This sample was the only sample which tested positive for an accelerant. It tested positive for gasoline. If this sample was extracted from the area of the interior storage room, its presence would be explained by and would corroborate Jonathan's statement that he kept a can with gasoline for the lawn mower in that room. This fact, coupled with the lack of an accelerant in any other location in the house would support Jonathan's theory that the second fire was a rekindle of the first fire. However, if that sample was taken from near the living room, the point of origin of the second fire according to Silman, it would corroborate Shelter's conclusion that the fire was incendiary. The exact location of the extraction of this sample was critical to an accurate cause and origin determination by Shelter.

Yet Silman did not even take any common-sense steps to confirm the exact location of the extraction point. He took no measurements of the outside dimensions of the house or the distance of the extraction point from any of the foundation walls. He did not know and did not ask anyone the number of rooms in the house or their configuration. He did not know and did not ask anyone for the location of the interior walls of the various rooms of the house. These failures led him to erroneously consider the master bedroom as the only room between the garage and the living room.

Compounding this error, Silman kept moving the extraction point of sample number two farther south from the garage toward the living room. During his on-site investigation on February 5, 2003, Silman placed a sample can at each of the five sample extraction sites within the fire scene. He then took a picture of the fire

scene. This picture shows the extraction point for sample number two as being very near to the foundation wall between the house and garage, which would place the extraction point for sample number two in the location of the interior storage room next to the garage. Yet his evidence log indicated that the extraction point for sample number two was between the front door in the living room and the garage. Silman's hand-drawn diagram made at the fire scene shows the extraction point for sample two as being in the center of the master bedroom, about one-half the distance between the front door in the living room and the garage foundation wall. But the computer-printed diagram accompanying Silman's final report to Shelter shows the extraction point of sample number two as the southeast corner to the master bedroom, very close to the interior wall between the master bedroom and the living room.

Shelter was aware of these discrepancies and possessed additional information which cast doubt upon Silman's location of this extraction point. Silman's final report to Shelter included Silman's evidence log, hand-drawn diagram, picture of the sample extraction sites, and computer-printed diagram. More importantly, Shelter had in its possession Asmus' diagram showing the relative location of the interior storage room and bath and closet area between the garage and the master bedroom. A simple comparison of Asmus' diagram with Silman's diagrams would cast substantial doubt upon the exact location of the extraction point of sample number two. Yet, either Shelter did not make such a comparison or, if it did, it chose not to investigate these discrepancies any further. The jury could have concluded that either failure was an inadequacy in Shelter's investigation.

The above-described inadequacies in Shelter's investigation constitute substantial evidence of its vexatious and recalcitrant attitude and thereby support the submission to the jury of its refusal to pay without reasonable cause or excuse. *De-Witt*, 667 S.W.2d at 710.

**(d) Deficiencies in explanation given at trial for denying the claim**

■ Shelter, through its designated corporate representative, Richard West, offered its explanation to the jury for denying the claim. West testified that one of the reasons Shelter denied the claim was Jonathan's refusal to submit to a polygraph test. Such a test is not admissible in evidence as a matter of law because of its unreliability. *Boling v. Boling*, 887 S.W.2d 437, 440 (Mo.App.1994). This is so even if the parties stipulate to its admission. Id. at 441. There was no evidence offered by Shelter that a polygraph test would provide it with any reliable information to consider in determining whether to deny the claim. Without evidence of reliability, the jury could have concluded that Shelter had chosen to rely upon chance rather than upon competent evidence in making its decision to deny the claim. *See State v. Biddle*, 599 S.W.2d 182, 190 n. 10 (Mo. banc 1980). This resort to speculation by Shelter may have been confirmed to the jury when Juanita disclosed that she also refused to submit to a polygraph test, but Shelter labeled her an "innocent coinsured." "A refusal to pay, based on a suspicion without substantial facts to support that suspicion, is vexatious." *Laster v. State Farm Fire & Cas. Co.*, 693 S.W.2d 195, 197 (Mo.App.1985). Thus, failure to support this reason for denying the claim with evidence of the reliability of such a test is substantial evidence of a vexatious and recalcitrant attitude.

■ West further testified that Shelter claimed Jonathan had a bad debt as anoth-

er reason for denying the claim. However, there was no evidence in the record and Shelter offered none supporting that Jonathan, in fact, owed a bad debt.[11] The uncontroverted evidence was that, at the time of the fire, Jonathan was in good financial shape: he had $2,739.50 in his checking account; he had forty to fifty thousand dollars in his 401(k); he made $85,000.00 per year; he owed no credit card debts; he had as his only indebtednesses the mortgage to Cendant on the house and a debt to a bank secured by his truck and boat; he had never had a second mortgage on the house; and he had never filed bankruptcy. The jury could have concluded that Shelter was speculating about this unsubstantiated bad debt. Such speculation is substantial evidence of a vexatious and recalcitrant attitude. *Id.*

West further explained that Shelter denied the claim because it received an anonymous letter indicating the house was intentionally burned and that Jonathan is crazy and dangerous. The credibility of such a letter is solely dependent upon the credibility of its author. *See,* e.g., *Grab ex rel. Grab v. Dillon,* 103 S.W.3d 228, 239 (Mo.App.2003); *State ex rel. Mo. Hwy. & Transp. Comm'n v. Sturmfels Farm Ltd. P'ship,* 795 S.W.2d 581, 590 (Mo.App.1990). The jury could have concluded that reliance by Shelter upon this anonymous letter without any basis upon which to judge its credibility was mere speculation. Once again, such speculation is substantial evidence of a vexatious and recalcitrant attitude. *Laster,* 693 S.W.2d at 197.

Each of the above-described deficiencies in Shelter's explanation for denying the claim is substantial evidence of its vexatious and recalcitrant attitude and thereby supports the submission to the jury of its

refusal to pay without reasonable cause or excuse. *DeWitt,* 667 S.W.2d at 710.

### (e) Disparate treatment of coinsureds

We have previously addressed an insurer's disparate treatment of coinsureds and observed:

> [W]here, as here, an insured's guilt or innocence and the respective interests of co-insureds in the property are matters in dispute, resolution is for the trier of fact, be it judge or jury. An insurer that undertakes to resolve a dispute over guilt or innocence and the insureds' respective interests in the property must bear the risk that the trier of fact might not only disagree with the insurer's decision but might also find the insurer's decision did not provide it with reasonable cause to refuse payment of the claim.

*Russell,* 834 S.W.2d at 222.

In the instant case, Shelter made the unilateral decision to label and treat Juanita as an "innocent coinsured." Yet the evidence, viewed in the light most favorable to the verdict, shows that Juanita had recently changed her property division demand to include some personal property located in Jonathan's house and that Jonathan opposed her having that property. Juanita and Jonathan spent the night together on the Thursday before the fire and had sexual relations. On Friday, Juanita called Danette Jones, Jonathan's girlfriend, and told her that she was moving back in with Jonathan. On Saturday night, Jonathan celebrated his birthday with Jones. The next day, Juanita went over to Jonathan's house and left him a note reiterating her previous property demands. She was the last person in the house before the first fire occurred. However, before this fire occurred, she re-

---

**11.** BLACK's LAW DICTIONARY 433 (8th ed.2004) defines "bad debt" as: "A debt that is uncollectible and that may be deductible for tax purposes."

moved a computer hard drive and a box of pictures. Late in the evening after the first fire had been extinguished, Juanita went back over to the house and while there, she observed Jonathan and Jones pull up to the garage, retrieve something out of Jones' car and leave. Juanita was the last person in the house before the second fire was called in to the fire department the next morning. Juanita already had another place to live and was not displaced by the fire. All of her personal belongings were located in her residence in Steele and were not destroyed by the fire. Juanita refused to take a polygraph test.

Virtually every explanation given by Shelter's corporate representative for denying Jonathan's claim had at least equal applicability to Juanita. Coupled with the facts in the preceding paragraph, Shelter actually had more reasons to suspect Juanita of setting the fire than Jonathan. The jury could have concluded that Shelter's apparent willful blindness toward suspecting Juanita and its elevation of Juanita to the level of an "innocent coinsured" is an indication of a vexatious and recalcitrant attitude by Shelter toward Jonathan and substantial evidence of Shelter's denial of Jonathan's claim without reasonable cause or excuse. *See Russell*, 834 S.W.2d at 222–23.

Shelter urges us to consider the cases of *Miller v. Farm Bureau Town & Country Ins. Co. of Mo.*, 6 S.W.3d 432 (Mo.App. 1999), *Mears v. Columbia Mut. Ins. Co.*, 855 S.W.2d 389 (Mo.App.1993), and *Francka v. Fire Ins. Exchange*, 668 S.W.2d 189 (Mo.App.1984), as all being "factually similar to this case." While they are similar in one respect—they all involved an open question of law or disputed fact which the insurer was free to litigate without penalty—they are all distinguishable from the instant case in that none of them found

any substantial evidence of the insurer's vexatious and recalcitrant attitude.

In *Miller*, we concluded that:

There was an open question of law or fact with respect to plaintiffs' claim that they were entitled to replacement costs without repairing, restoring or replacing their dwelling as evidenced in Point I. There was an open question as to whether one or both of the fires at the dwelling had been intentionally set.

*Miller*, 6 S.W.3d at 440. There was no evidence identified in the opinion that the insured acted with a vexatious or recalcitrant attitude in denying the claim. Without such evidence, the insured certainly had the right to litigate these open questions of law and fact, and the trial court was in error in submitting the vexatious refusal claim to the jury. *Id.*

In *Mears*, the Western District of our Court was presented with a case where the only evidence or argument plaintiff offered to show a vexatious and recalcitrant attitude on the part of the insurer was that the insurer's investigation "was too thorough and intensive." *Mears*, 855 S.W.2d at 394. The Western District rejected this argument, stating:

In the present case, there is no evidence that Columbia's refusal to pay was without reasonable cause. The defendant's investigation was thorough, as would be expected under the circumstances, especially in light of the facts which indicated arson, and its actions did not amount to vexatious behavior. In fact, the evidence, as it developed, supports Columbia's need to fully investigate plaintiffs' claim. It would not be appropriate to hold the defendant company liable because its investigation was too thorough. To the contrary, *an incomplete investigation could very likely be the basis for vexatious and unreasonable refusal to pay*. As a result, we hold that defen-

dant's refusal to pay the insurance proceeds short of a judicial determination was reasonable, *not vexatious and not recalcitrant.*

*Mears,* 855 S.W.2d at 395. (Emphasis added).

Finally, in *Francka,* the plaintiff did not contend that there was not a litigable issue, but rather contended that there was other evidence that the insurer's attitude was vexatious and recalcitrant in three respects: first, the insurer changed its reason for denying the claim contained in its original letter denying the claim; second, the insurer had falsely asserted that personal property had been removed from the house before the fire started; and, third, the insurer did not make a thorough investigation of the fire. *Francka,* 668 S.W.2d at 190. We found that the evidence did not support the first claim. *Id.* While not setting forth the evidence in the record upon which plaintiff relied in asserting his second and third claims or explicitly addressing whether it amounted to substantial evidence of a vexatious and recalcitrant attitude on the part of the insurer, we determined that "[t]he investigations of the State Fire Marshal and defendant's investigator, at least when combined, were sufficient to give defendant a reasonably based belief that plaintiff set the fire and that items had been removed before it was started." *Id.* We then concluded that the vexatious refusal to pay claim should not have been submitted to the jury. *Id.* Nothing in the meager facts actually disclosed in *Francka* supports Shelter's contention that its actions as particularly delineated in this opinion do not constitute substantial evidence of its vexatious and recalcitrant attitude in refusing to pay the claim.

We "will reverse the jury's verdict for insufficient evidence only where there is a complete absence of probative fact to sup-port the jury's conclusion." *Dhyne,* 188 S.W.3d at 458. We conclude, based upon the totality of our discussion on this point, that substantial evidence was presented to support the trial court's submission to the jury of Shelter's refusal to pay without reasonable cause or excuse. Point I is denied.

4) *Points II and III—Treatment of Funds Paid by Shelter Into Court Registry*

■ Shelter's third point claims that the trial court erred as a matter of law in submitting Instruction No. 8 which directed the jury, if they found in favor of Jonathan, to award him $83,100 for damage to the dwelling, $58,170.00 for damage to personal property, $4,700 for debris removal, a sum for reasonable additional living expenses, and interest from the date the claim became due and payable under the policy. Shelter argues that the trial court, as a matter of law, erred in submitting the $83,100 dwelling coverage, $29,085 of the personal property coverage, and $2,350 of the debris removal coverage, because Shelter had previously paid these sums into the court's registry on October 25, 2004, and Instruction No. 8 failed to give it credit for such payment.

Shelter's second point makes a similar argument. In that point, Shelter contends the trial court erred in denying its post-trial Motion to Amend the Judgment, Motion for Remittitur, and for Other Post–Trial Relief, as a matter of law, in that the trial court was required to reduce the amount of the jury verdict in the judgment by the amount Shelter had previously deposited into the court's registry and to make a corresponding pro-rata reduction in the amount of interest, vexatious penalty, and attorney fees. Because both of these points focus on the legal effect of the deposited funds, we will address them to-

gether. Also, because both points allege trial court error as a matter of law and we find no such error, we will dispense with any discussion of the applicable standard of review on each point. The resolution of these points requires a review of: (1) the contract obligations derived from the policy of insurance; (2) an additional obligation placed upon Shelter by statute; (3) the status of current case law; and (4) the application of these principals to the facts of this case.

Jonathan and Juanita entered into a contract of insurance with Shelter whereby Shelter agreed, among other matters, in consideration of the premium paid, to pay coinsureds Jonathan and Juanita $83,100.00 for their dwelling, $58,170 for their personal property, and $4,700.00 for debris removal if the dwelling and personal property were destroyed by fire ("Policy Obligation"). However, the contract of insurance relieves Shelter from the Policy Obligation to pay for such loss if it resulted from an action by or at the direction of either Jonathan or Juanita committed with the intent to cause the loss, i.e., if either coinsured intentionally set the fire ("Policy Defense"). By the express terms of the policy, the Policy Obligation shall be paid directly to Cendant to the extent of its interest in the property. Such a payment, while not paid directly to Jonathan and Juanita, inures to their benefit in that it is applied to the satisfaction of the underlying debt.

Shelter additionally agreed in the contract for insurance to pay Cendant even if Shelter had a Policy Defense and thereby had no Policy Obligation ("Mortgagee Obligation"). However, any payment by Shelter to Cendant pursuant to the Mortgagee Obligation places Shelter, at its option, either in the position of Cendant by assignment of the note and mortgage, or gives Shelter the right of subrogation to seek reimbursement from Jonathan and Juanita. A payment by Shelter under either option does not benefit Jonathan and Juanita, in that they simply would then owe Shelter instead of Cendant.

Section 375.1312, first enacted by the legislature in 1998, places a statutory obligation upon Shelter ("Innocent Coinsured Obligation") similar to the Mortgagee Obligation. An "innocent coinsured" is "an insured who did not cooperate in or contribute to the creation of a property loss and the loss arose out of a pattern of domestic violence." § 375.1312.1(3). The first sentence of § 375.1312.5 provides:

If an innocent coinsured files a police report and completes a sworn affidavit for the insurer that indicates both the cause of the loss and a pledge to cooperate in any criminal prosecution of the person committing the act causing the loss, then no insurer shall deny payment to an innocent coinsured on a property loss claim due to any policy provision that excludes coverage for intentional acts.

Thus, if Juanita meets the definition of an "innocent coinsured" and meets the prerequisites set forth in § 375.1312.5, then Shelter cannot assert the Policy Defense—that the property was intentionally burned by an insured—against her and must pay her pursuant to the Policy Obligation. Section 375.1312.5 further provides that "insurers shall not be required to make any subsequent payment to any other insured for the part of any loss for which the innocent coinsured has received payment." This provision grants Shelter a credit against the Policy Obligation for any payment made to Juanita as an innocent coinsured at the time she receives such payment. The last sentence of § 375.1312.5 authorizes that "[a]n insurer making payment to an insured shall have all rights of subrogation to recover against

the perpetrator of the loss." Thus, if Shelter pays Juanita as an innocent coinsured pursuant to this section because it is statutorily barred from asserting the Policy Defense against her then upon making such payment, Shelter has a right of subrogation to recoup the payment from Jonathan, against whom it is not barred from asserting the Policy Defense. Such a payment would not benefit Jonathan, in that he would then owe Shelter for the loss instead of owing Juanita for the loss, due to his intentional conduct. Therefore, any payment by Shelter to Juanita pursuant to the Innocent Coinsured Obligation would not be a payment on the Policy Obligation to Jonathan.

All of the cases, with one exception, which have addressed Missouri law on the issue of whether the insurer is entitled to a credit or offset for a payment made to the mortgagee, have involved the insurer's exercise of its option to take an assignment from the mortgagee of the underlying note and mortgage in exchange for the payment. *See Kilpatrick v. Hartford Fire Ins. Co., Inc.*, 701 S.W.2d 755, 758 (Mo. App.1985); *Sadler v. Home Sav. of America*, 733 S.W.2d 856, 857 (Mo.App.1987); *McPheeters v. Community Fed. Sav. & Loan Assoc.*, 736 S.W.2d 62, 64 (Mo.App. 1987); *Silman Custom Painting, Inc. v. Aetna Life & Cas. Co.*, 990 F.2d 1063, 1067 (8th Cir., 1993); *Mears*, 855 S.W.2d at 395. All have held that the insurer who now sits in the position of the mortgagee in such a situation is not entitled to a credit against the Policy Obligation. Id. The one case exception with a somewhat different factual basis addressing this issue is *Crewse v. Shelter Mut. Ins. Co.*, 706 S.W.2d 35 (Mo. App.1985).

In *Crewse,* the Western District of our Court observed that:

[Insurer's] payment to the [Mortgagee] satisfying the *Crewses' obligation to that*

*bank* may be viewed in one of two ways. The satisfaction of the note may be seen as a partial prepayment of the $15,000 insurance on the dwelling building and the $8,867 should have been accounted for in the instruction. On the other hand, Shelter's payment may be viewed as a purchase of the right to sue on the note as against the Crewses and replace the bank as a substituted creditor.

*Crewse,* 706 S.W.2d at 42–43. The Court adopted the latter view and denied the insurer a credit, noting that the "[insurer] stated that through the Crewses' misrepresentation they became obligated on the notes pursuant to the standard mortgage clause in the insurance policy." *Id.* at 43. The Court further found support in the fact that "[n]o evidence was presented by [Insurer] that the Crewses were in arrears in their payment of the note since the purchase of the note by [insurer]." *Id.*

The Eight Circuit of the United States Court of Appeals has characterized the holdings in *Crewse* and *Kilpatrick* as follows:

We read these cases to mean that an insurer which elects under a mortgage clause to deny coverage, pay off its insured's loss mortgagee, and then counterclaim for the amount it paid to the mortgagee is entitled to a credit or offset toward a judgment entered against it *if the insurer's payment constitutes a partial payment of the underlying policy claim. Crewse,* 706 S.W.2d at 42–43. If the insurer's payment is not deemed a payment on a policy claim, the insurer is a purchaser of the note and mortgage, and as a subrogee is entitled to enforce the note by way of a noncompulsory counterclaim to its insured's coverage suit. *Id.; Kilpatrick,* 701 S.W.2d at 757–58.

*Silman Custom Painting, Inc.,* 990 F.2d at 1067. (Emphasis added). We have no

dispute with this characterization as an accurate statement of the law.

With these contractual, statutory, and case law principals in mind, we now turn to the facts surrounding the payment of the funds by Shelter into the court's registry and their later disbursement. Count I of Jonathan's petition sought enforcement of the Policy Obligation against Shelter. Shelter's answer asserted the Policy Defense as a bar to this obligation. Shelter's counterclaim against Jonathan sought a declaratory judgment enforcing its rights of subrogation against Jonathan for any sums paid by Shelter to Cendant, pursuant to the Mortgagee Obligation, or to Juanita, pursuant to the Innocent Coinsured Obligation.

With the pleadings in this posture, Shelter filed its Motion to Deposit Funds into Registry of the Court. This motion asserted that Shelter was only obligated to pay these funds to Cendant and Juanita pursuant to its respective Mortgagee Obligation and Innocent Coinsured Obligation. Shelter further specifically alleged in this motion that it "is refusing to pay [Jonathan's] claim under the policy as it contends [Jonathan] intentionally set the fire and caused the loss."

The trial court granted Shelter's motion by order, stating that Shelter:

shall be allowed to deposit into the Registry of the Court the following amounts, representing the undisputed amounts *Shelter contends* are due and owing Defendants [Juanita] and [Cendant] respectively:

1. $83,100.00 ... due an [sic] owing [Cendant] *as payment for the mortgage note* made under the claim.

2. $31,435.00 due and owing [Juanita] as an "innocent co-insured" under the policy of insurance. (Emphasis added).

Pursuant to this order, Shelter deposited the funds into the court's registry. As a result, the pleadings, Shelter's motion, and the court's order all support that Shelter deposited these funds into the court's registry and only consented for them to be considered solely as payment for the mortgage note under the Mortgagee Obligation and as payment of the Innocent Coinsured Obligation. Nothing in these documents or otherwise found in the record indicates that these funds were deposited by Shelter in payment of the Policy Obligation to Jonathan.

In fact, Shelter's motion specifically states that it is refusing to pay the Policy Obligation to Jonathan because of his alleged intentional act. It follows, then, that because the initial deposit of these funds by Shelter did not constitute a partial payment of the underlying policy claim of Jonathan, Shelter is not entitled to a credit against the Policy Obligation at that time or at anytime thereafter, as long as the funds remained on deposit under the stated conditions. *Crewse,* 706 S.W.2d at 43–44; *Silman Custom Painting, Inc.,* 990 F.2d at 1067. Therefore, the trial court did not err as a matter of law in submitting to the jury Instruction No. 8, which did not include such a credit. Point III is denied.

The jury returned its verdict in favor of Jonathan on the Policy Obligation and against Shelter on the Policy Defense on February 5, 2003. On that date, Jonathan became legally entitled to the entry of a judgment in accordance with that verdict, the later entry of which by the trial court is a ministerial act. *Mosher v. Levering Inv., Inc.,* 806 S.W.2d 675, 676 (Mo. banc 1991). The record reflects that the trial court instructed Jonathan's counsel to prepare the formal judgment entry in accordance with the verdict and submit it to Shelter's counsel for review. This was

accomplished on February 9, 2005, and Shelter immediately objected to the form of the proposed judgment on the ground that, among others, it failed to give Shelter credit for the amounts previously deposited by Shelter into the court's registry. The next day, Jonathan's counsel submitted the proposed form of judgment to the trial court noting Shelter's objection and stating: "Of course, we all agree that Shelter is entitled to credit for the $83,100 and the $31,465 paid into the Court registry once it is disbursed." On March 14, 2005, the trial court executed and entered the judgment in the form submitted by Jonathan's counsel.

Meanwhile, between the date of the verdict and the date of the judgment, Jonathan filed a Motion to Enforce Release and Settlement Agreement on February 14, 2003. Three days later, the trial court entered its order directing the clerk to immediately disburse $83,100 to Cendant, which the clerk accomplished on February 18, 2003. This payment to Cendant pursuant to the settlement agreement was in satisfaction of the note and deed of trust, relieving Jonathan and Juanita of liability thereon and, as such, constituted a partial payment on the policy claim. Thus on this date, Shelter became entitled to a credit against the Policy Obligation, which had been reduced to a verdict awaiting the ministerial act of entry of judgment. *Crewse*, 706 S.W.2d at 43–44; *Silman Custom Painting, Inc.*, 990 F.2d at 1067.

On April 12, 2005, Shelter filed a Motion to Amend the Judgment, Motion for Remittitur, and for Other Post–Trial Relief. In this motion, Shelter asked the court to amend the judgment to reflect the previously deposited amounts as a set-off against the Policy Obligation and to correspondingly reduce on a pro-rata basis the award of interest, vexatious penalty, and attorney fees. The trial court denied this motion. Shelter's second point claims this

denial was erroneous as a matter of law. We disagree.

As previously discussed, Shelter was not entitled to a credit or set-off at the time of deposit or at any time thereafter until the time such funds were actually disbursed, because the deposits were not made or held as a payment on the Policy Obligation to Jonathan. Further, because the entry of a judgment upon a jury verdict is a ministerial act, the trial court had no discretion to alter the amount of the verdict in the judgment based upon acts or events-the disbursement of the deposited funds-which occurred after the verdict was rendered. The judgment entered by the trial court on March 14, 2005 accurately reflected the jury's verdict rendered on February 5, 2005. Therefore, any payments made by Shelter after the date of the verdict from deposited funds or otherwise are simply payments in partial satisfaction of the judgment. As such, the trial court did not err in denying Shelter's Motion to Amend the Judgment, Motion for Remittitur, and for Other Post–Trial Relief. Point II is denied.

### 5) *Motion for Award of Attorney Fees on Appeal*

Jonathan has filed a Motion for Attorney Fees on Appeal, alleging that he is entitled to such an award under the provisions of § 375.420. This motion was taken with the case. Shelter filed no suggestions in opposition to the motion.

■ As a general rule, referred to as the "American Rule," litigants must bear their own attorney fees in the absence of a statute or agreement providing otherwise. *Rosehill Gardens, Inc. v. Luttrell*, 67 S.W.3d 641, 648 (Mo.App.2002). As previously discussed in this opinion, the jury determined by its verdict that Shelter was obligated to pay Jonathan's reasonable attorney fees pursuant to the provisions of § 375.420. We have found that the submis-

sion of that issue to the jury was supported by substantial evidence. The jury verdict also set and determined the amount of Jonathan's reasonable attorney fees through the trial of this case. Jonathan's motion alleges he has incurred additional attorney fees in defending the post-trial motions and this appeal. Because Shelter's statutory obligation to pay Jonathan's reasonable attorney fees has previously been established by the jury verdict and judgment entered pursuant to that verdict, which we have upheld in this appeal, Jonathan's Motion for Attorney Fees on Appeal is sustained. § 375.420.

We have the expertise and authority to fix the amount of attorney fees on appeal. *Rosehill Gardens, Inc.,* 67 S.W.3d at 648. However, because the trial court is in a much better position to hear evidence and argument on this issue and make a determination of the reasonableness of the requested fee, we prefer, in this case, to defer our authority to the trial court. *Id.* Therefore, we remand to the trial court with directions to conduct a hearing to determine the reasonableness of the attorney fees requested on appeal by Jonathan and enter judgment against Shelter accordingly.

### 6) *Decision*

The judgment of the trial court entered on March 14, 2005 is affirmed in all respects. Jonathan's Motion for Attorney Fees on appeal is sustained, and the case is remanded to the trial court with directions to conduct a hearing to determine the reasonableness of the requested fees and to enter judgment against Shelter accordingly.

BATES, P.J., C.J., and GARRISON, J., concur.